## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| The Lane Construction Corporation, a Connecticut corporation, | |
| Plaintiff, | Docket No. _____ |
| vs. | |
| Skanska USA Civil Southeast Inc., a Virginia corporation, | **COMPLAINT** |
| Defendant. | |

## COMPLAINT

For its Complaint against Skanska USA Civil Southeast Inc. ("Skanska SE"), plaintiff The Lane Construction Corporation ("Lane"), by and through its attorneys, Pillsbury Winthrop Shaw Pittman LLP and Baker & Hostetler LLP, alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      Skanska SE is the manager of a joint venture ("SGL") that was engaged to design and construct the I-4 Ultimate highway project (the "Project") in Central Florida. Lane is a minority partner in the SGL joint venture.

2.      The Project's "concessionaire," I-4 Mobility Partners OpCo LLC ("I4MP"), engaged SGL to be the Project's design-builder.

3.      This lawsuit arises out of Skanska SE's willful breach of its fiduciary duty to its joint venture partners, and gross negligence in connection with its participation in, and as the managing partner of, SGL.

4.      The Florida Department of Transportation ("FDOT") engaged I4MP to design, build, and operate the Project for 40 years after construction is complete.

5.      Skanska SE's corporate affiliate, Skanska Infrastructure Development ("Skanska Concessionaire"), owns 50% of I4MP and, as a result, stands to profit from the long-term operation of the Project.

6.      SGL has suffered and will continue to suffer enormous financial losses in connection with the construction of the Project.  At a critical moment, SGL could have triggered a right to exit the Project, which would have cut-off and stemmed the joint venture's losses.  Lane directed Skanska SE to act in the best interests of SGL by triggering that right, but Skanska SE refused to do so to the detriment of SGL and Lane.

7.      Skanska SE refused to trigger SGL's right to exit the Project because Skanska SE's judgment was impaired by a conflict of interest.  SGL's exit from the Project would have had substantial adverse and potentially long-term financial repercussions to I4MP, and, as a consequence, to Skanska Concessionaire and, from there, up the corporate family tree to Skanska AB ("Skanska Parent"), the ultimate parent corporation of both Skanska SE and Skanska Concessionaire.

8.      In the absence of the conflict of interest, Skanska SE, acting in the best interests of the partnership and all of its partners, would have triggered SGL's ability to

exit from the Project saving themselves and their joint venture partners from hundreds of millions of dollars of cost overrun and damages.

9.     Simply put, if Skanska SE had acted in the best interest of SGL (as opposed to serving the interests of the Skanska corporate family), Skanska SE would have exercised SGL's option to exit the Project with the full support of the other JV members, Lane and Granite Construction Company ("Granite").

10.     By acting against the best interests of SGL, Skanska SE was grossly negligent in the exercise of its managerial duties and breached its fiduciary obligations to Lane and Granite.

11.     As a consequence, Lane is suffering, and will continue to suffer substantial losses on the ongoing Project that could have been, and should have been, avoided.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of Connecticut and Virginia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Skanska SE submitted to the Court's jurisdiction under the terms of SGL's Joint Venture Agreement. (Ex. 1, § 19.2). Additionally, this Court has personal jurisdiction over Skanska SE because it is conducting business activity in the State of Florida, the claims and harm alleged herein arise from such activity, and the exercise of jurisdiction is otherwise reasonable.

14.     Skanska SE agreed to this venue under the terms of SGL's Joint Venture Agreement, (Ex. 1, § 19.2), and venue here is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this District.

## PARTIES AND JOINT VENTURE

15.     The Lane Construction Corporation is a Connecticut corporation with its principal place of business in Cheshire, Connecticut. Among other things, Lane provides construction services for large, complex civil infrastructure projects.

16.     Skanska SE is a Virginia corporation with its principal place of business in Virginia Beach, Virginia. Among other things, Skanska SE provides construction services for large, complex civil infrastructure projects.  Skanska SE is a subsidiary of Skanska AB ("Skanska Parent"), a large internationally known construction and engineering firm.

17.     Lane and Skanska SE are members of Skanska-Granite-Lane, A Joint Venture ("SGL" or the "Joint Venture").  The SGL joint venture was formed by Skanska SE, Granite, and Lane for the purpose of bidding on and building the Project.

18.     Skanska SE, Granite, and Lane executed a Joint Venture Agreement on June 3, 2014 establishing the Joint Venture.  The Joint Venture Agreement is attached hereto as "Exhibit 1."  SGL's profits and losses are being divided up - 40% to Skanska SE, and 30% each to Granite and Lane.

19.     Skanska SE is SGL's managing partner. *See* Ex. 1, § 5.

# FACTUAL BACKGROUND

**A.  The I-4 Ultimate Project**

20.     The Project is a public-private partnership developed by FDOT to reconstruct, operate, and maintain a 21-mile stretch of I-4 that runs from west of Kirkman Road in Orange County, through downtown Orlando, to east of State Road 434 in Seminole County.

21.     I4MP is a joint venture between Skanska Concessionaire and John Laing Investments Ltd. with each entity owning fifty percent (50%).  Skanska Concessionaire provided approximately 71% of the initial equity required of I4MP ($73 million), which it will receive at the end of the concession.

22.     Skanska SE and Skanska Concessionaire are corporate affiliates, both of which answer to their ultimate parent company, Skanska Parent.

23.     On September 4, 2014, FDOT and I4MP entered into the "Concession Agreement for I-4 Ultimate Project between Florida Department of Transportation and I-4 Mobility Partners OpCo LLC" (Contract #E5W13) (the "Concession Agreement"). The Concession Agreement granted I4MP the exclusive right to develop, design, construct, finance, operate, and maintain the Project for 40 years.

24.     The majority of I4MP's profits from the Project will be realized from the "availability payments" FDOT makes to I4MP in the operation and maintenance phase of the Project.  Operation and maintenance begins *after* the Project has been constructed.

25.      On September 4, 2014, I4MP and SGL entered into the "Design-Build Agreement for I-4 Ultimate Project between I-4 Mobility Partners OpCo LLC and

Skanska-Granite-Lane, A Joint Venture" (the "Design-Build Agreement").  The Design-Build Agreement requires SGL to design, engineer, procure, install, construct, test, and commission the Project.

26.     The Design-Build Agreement includes a number of "drop down" provisions that incorporate certain definitions and terms from the Concession Agreement into the Design-Build Agreement.

27.     Both the Concession Agreement and Design-Build Agreement provided for a Project substantial completion date of December 31, 2020, and a final completion date of March 31, 2021.

28.     Construction of the Project began in February 2015.

**B.  Drilled Shaft Claim and Delays**

29.     On June 8, 2018, SGL certified a claim to I4MP for approximately $48 million in costs and a 245-day time extension relating to the design for the structural support shaft (the "Drilled Shaft Claim").

30.     Because the Drilled Shaft Claim was based upon actions taken by FDOT, I4MP was able to pass that claim through to FDOT.  Before it did so, I4MP added a demand for its own additional costs.

31.     The combined claims were certified and submitted to FDOT on June 11, 2018.  In total, I4MP asserted FDOT owed it (and SGL) an additional $100,393,490 in compensation and 245 days to reach substantial and final completion.

**C.  The Realization that SGL Would Not Be Able to Turn a Profit**

32.     At the time that SGL submitted its bid to I4MP, SGL expected to realize approximately $215 million of profit.

33.     As the Project progressed, it became evident to SGL that the December 31, 2020 substantial completion date and the March 31, 2021 final completion date could not be met.  By March 2015, it was understood that substantial completion would not be met until August 11, 2021 and that final completion would not be met until November 9, 2021.

34.     In the second half of 2018, Skanska SE struggled to provide accurate cost accounting and projections to SGL.  While it was unclear how much of a loss SGL was projected to suffer, it was clear that SGL would earn no profit if it completed the Project. In fact, SGL would suffer a loss of significant magnitude—though the amount of the projected loss was impossible to predict at that time due to Skanska SE's inability to accurately account for SGL's actual and projected costs.

**D.  SGL's Right to Terminate the Design Build Agreement and Concession Agreement**

35.     The Concession Agreement granted I4MP the right to terminate the Concession Agreement if the Project suffered an FDOT-caused delay of more than 180 days.

36.     Similarly, the Design-Build Agreement granted SGL the right to compel I4MP to terminate the Concession Agreement if the Project suffered an FDOT-caused delay of more than 180 days.

37.    When I4MP certified that it was entitled to a 245-day extension based on a FDOT-Caused Delay and/or FDOT change, SGL then had the power to avoid incurring hundreds of millions of dollars of further losses on the Project.

38.    Relevant provisions of the Design-Build Agreement are set forth in Appendix 23—the agreement's Equivalent Project Relief Provisions.

38.a.    Under the Equivalent Project Relief Provisions, I4MP was required to "in good faith use reasonable efforts to enforce its rights, entitlements, remedies and defenses . . . under the Concession Agreement for the benefit of [SGL] . . . ."  In other words, Appendix 23 to the Design Build Agreement gave SGL pass-through rights that afforded SGL the benefits of I4MP's rights against FDOT.  The pass-through rights in Appendix 23 expressly contemplated that SGL could be entitled to relief that resulted in SGL being released from its obligations to perform under the Design-Build Agreement.

38.b.    One form of Equivalent Project Relief available to SGL under Section 2.1.2 of Appendix 23 included "any other relief or defense (including, subject to Section 2.8.2, any extension of time or limitation of liability applicable to liabilities owed to FDOT under the Concession Agreement) from the performance of its obligations under, or from termination of, this agreement."

-8-

38.c.   Section 2.8 and 2.8.1 further provided that: "Following agreement or final determination of [SGL's] Equivalent Project Relief in Sections 2.1 through 2.7: . . . where such Equivalent Project Relief consists of relief from performance of obligations under the Concessional Agreement, [SGL] shall be relieved from the performance of its obligations under this Agreement to the same extent."

39.     Thus, if I4MP had the right to terminate the Concession Agreement, and it would benefit SGL to do so, I4MP was required to exercise its right to termination.  Of course, the prerequisite was that I4MP needed to have the right to terminate—which it did, by virtue of the Drilled Shaft Claim and two other Relief Events.

40.     I4MP's right to termination arises under Section 20.2.1.1 of the Concession Agreement, which provides that either I4MP or FDOT may deliver to the other party written notice of its conditional election to terminate the Concession Agreement based on "Relief Events" that will result in a delay in achieving Substantial Completion beyond the period when FDOT is required to make payments under Section 10.2.2.4 of the Agreement, which is 180 days in the aggregate.

41.     Since the Drilled Shaft Claim asserted 245 days of Relief Events (65 days more than needed to terminate) and I4MP had certified that claim to FDOT—while demanding $50,597,693 for its own delay in payments from FDOT—SGL knew that I4MP had met the prerequisite for termination of the Concession Agreement.

42.     Importantly, while I4MP held the right to seek termination of the Concession Agreement, SGL held the right to demand that I4MP seek termination for its benefit.

43.     This right gave rise to several strategic options, all of which would inure to the benefit of SGL over the long term:

        43.a.   I4MP could submit the termination notice to FDOT, FDOT could accept the notice, and FDOT could then terminate the Design-Build Agreement.

        43.b.   I4MP could submit the termination notice to FDOT, FDOT could accept the notice, and FDOT could exercise its rights to have I4MP assign the Design-Build Agreement to FDOT.

        43.c.   I4MP could submit the termination notice to FDOT, FDOT could accept the notice, but elect to continue the work for up to 180 days while also paying additional compensation.

        43.d.   I4MP could refuse to submit the termination notice and dispute SGL's rights under the Design-Build Agreement's Dispute Resolution Procedure.  If SGL was found to be entitled to termination, I4MP would owe SGL compensation.

        43.e.   I4MP could refuse to submit the termination notice, but pay SGL the reasonable value of the Equivalent Project Relief that SGL would have been entitled to recover if I4MP had complied in full with its obligations.

-10-

44.     Exercising any of these strategic options would have created liabilities for I4MP and placed the burden of executing termination and addressing any potential challenges to termination on I4MP.  But Skanska SE refused to force I4MP to pursue these strategic options due to the conflict created by its sister affiliate's ownership interest in I4MP.

45.     On October 26, 2018, Lane sent a letter to Skanska SE and Granite explaining that SGL "is within its rights to demand that [I4MP] issue a notice of termination of the Concession Agreement to FDOT as long as there has been a Relief Event causing substantial completion to be delayed by more than 180 days."  Lane further explained that "[b]y exercising termination, SGL can stop performance and avoid projected future performance losses, which, as we all know at this point, will be significant."

46.     While Skanska SE feigned consideration of pursuing termination, Skanska SE never gave it due consideration because the conflict of interest it had with Skanska Concessionaire.

**E.  Settlement of the Drilled Shaft Claim**

47.     Upon information and belief, to frustrate SGL's ability to trigger termination, Skanska SE began negotiations with I4MP and FDOT in and around October and November of 2018 focused upon settling the Drilled Shaft Claim and other various claims brought by SGL and I4MP for Relief Events on the Project.  Skanska SE led negotiations and provided only occasional updates to Lane and Granite on the status of

the negotiations.  Skanska SE took the position that under the Joint Venture Agreement, it had the right to settle with or without the support of Lane and Granite.

48.     Upon information and belief, Skanska SE's negotiations with I4MP and FDOT resulted in a proposed settlement in the form of a supplemental agreement to the Concession Agreement, called Supplement Agreement 22 ("SA22"), and a corresponding downstream supplemental agreement to the Design-Build Agreement.

49.     By October 2019, Skanska SE informed Granite and Lane that the proposed SA22 settlement would generate approximately $125,000,000 in settlement funds for SGL a sum significantly less than what Skanska SE had previously represented to Lane and Granite.

50.     However, given the additional costs SGL faced, SGL only improved its margin by $55,600,000 as a result of the SA22 settlement.

51.     On October 22, 2019, Lane sent a letter to Skanska SE stating Lane's concern that the settlement would only net a total of $125,000,000.  Lane stated its position that the proposed settlement was not in the best interest of SGL because $125,000,000 would fall far short of covering the hundreds of millions of dollars in losses that would be sustained by SGL if SGL continued the Project.  Lane explained: "We continue to consider the termination option much better for the JV for the reasons that we have articulated for more than a year now.  Most importantly, termination will stop the JV's losses at the present amount of $150,000,000, and it will preserve our right to recover under the current claims, which are roughly the same value as the settlement."

Lane requested that SGL demand that I4MP immediately seek to terminate the Concession Agreement.

52.     On October 25, 2019, Skanska SE responded to Lane's October 22, 2019 letter, rejecting Lane's request that SGL pursue termination of the Concession Agreement.  Skanska SE asserted that it believed that course of action was "not advisable."  Even though Skanska SE understood at that time that SGL would suffer substantial losses unless termination was pursued, the conflict of interest among Skanska entities caused Skanska SE to rule out termination as an option; that is, Skanska SE refused to proceed with termination because of the conflict of interest that Skanska SE had in ensuring that I4MP was not financially or reputationally damaged by termination.

53.     Despite the settlement requiring unanimous consent from the members of SGL (through the Executive Board of SGL), and despite Lane's vehement opposition to the settlement agreement, Skanska SE exercised its purported authority as Managing Party of SGL to direct Lane, and Granite, to accept and execute the SA22 settlement. Lane did so under a full reservation of rights against Skanska SE.

54.     On April 10, 2020 the SA22 settlement was executed thereby sealing SGL's fate by waiving SGL's right to terminate the Concession Agreement and Design-Build Agreement.  In the same month, SGL was expected to face losses of $441 million, vastly greater than the SA22 settlement.

**F.  Skanska SE's Refusal to Terminate Due to Its Conflict of Interest**

55.     Skanska SE refused to take action that could potentially harm I4MP, because Skanska SE knew that its parent company considered the construction work and

the concession work to be one enterprise being undertaken by Skanska Parent.  Since the

Project initially began in 2014, Skanska Parent has treated its interest in the Project as

one enterprise among its subsidiaries.  In fact, in its 2014 annual report, Skanska Parent

stated that "Skanska is acting as both builder and investor" on the Project.  Upon

information and belief, as part of its efforts to maintain the financial success of this single

enterprise, Skanska Parent coordinated, and placed pressure on its subsidiaries to

coordinate, the long-term financial viability of I4MP's concession.

56.     In 2016, a former Chief Financial Officer of Skanska USA Civil—the

immediate parent of Skanska SE—was made the President of Skanska Concessionaire.

Upon information and belief, this transfer allowed Skanska SE and Skanska

Concessionaire to better coordinate their financial positions on the Project.

57.     Skanska Parent's ability to maximize profits on the Project requires I4MP

to continue operating the Project under the Concession Agreement.  As explained in

Skanska Parent's 2014 annual statement: "The concession company, I-4 Mobility

Partners [I4MP], in which Skanska and John Laing are 50/50 owners, will be

compensated with availability payments that require keeping the facility open and

maintained for travelers."

58.     Upon information and belief, at the time that Lane was calling for

termination in the fall of 2018, Skanska SE could see that even though it was likely to

incur substantial losses, by allowing its sister affiliate, Skanska Concessionaire, to realize

its concession profits and recoup its initial equity investment in the Project, the Skanska

entities together could still achieve a profit of approximately $200 million.

59.     As such, Skanska Parent is contractually invested in the financial success of Skanska Concessionaire in the I4MP joint venture.  In fact, Skanska Parent is the parent guarantor for Skanska Concessionaire's performance of the Concession Agreement, and, therefore, has a direct financial interest in ensuring the financial viability of I4MP.  This financial interest increased Skanska SE and Skanska Parent's motivation to ensure Skanska Concessionaire's ability to maintain the Concession Agreement and to realize profits during operation of the Project.  Additionally, because Skanska Parent is a beneficiary of any revenue realized by Skanska Concessionaire at the concessionaire level, Skanska Parent has an interest in seeing Skanska Concessionaire succeed even at the cost of SGL.

60.     Skanska SE has sought to ensure that it does not act detrimentally towards its sister affiliate, Skanska Concessionaire, on its own accord, but Skanska Parent also exerted influence upon Skanska SE.  For example, during the October 19, 2018 meeting of the Executive Board of SGL, representatives of Skanska SE's parent company leadership were present, including the President and CEO of Skanska USA Inc., Richard Kennedy.  Upon information and belief, Mr. Kennedy represented the interests Skanska Parent (a member of his company's board of directors) at the meeting, which included the financial success of Skanska Concessionaire.

61.     Skanska SE also failed to inform Lane that its ultimate parent company, Skanska Parent, was treating the Project as one enterprise and had a vested interest in ensuring that I4MP remained financially successful to the detriment of SGL.

## COUNT ONE: BREACH OF FIDUCIARY DUTY

62.     Lane repeats and realleges the preceding paragraphs, as if fully set forth herein.

63.     As Lane's joint venture partner, Skanska SE owes SGL and Lane the duty of utmost faithfulness, the duty of loyalty, the duty of care, and other fiduciary duties in connection with SGL's performance of the Design-Build Agreement and the operation of SGL, both as a member and as the managing partner of SGL.

64.     As a contractual joint venture, SGL and its members are subject to Florida's Revised Uniform Partnership Act ("RUPA").  Fla. Stat. Ann. § 620.81001, et seq.  Florida's RUPA imposes the duty of loyalty and the duty of care on partners and joint venture members.

65.     Under its duties of loyalty and care, Skanska SE had the obligation to refrain from dealing with SGL and the conduct of SGL's business on behalf of and for the benefit of a party having an interest adverse to SGL's interests.  Yet Skanska SE also owed conflicting fiduciary duties to its ultimate parent company, Skanska Parent.

66.     Skanska SE is certain to suffer a loss on the Project at the construction level, and therefore the only way that Skanska Parent could realize a profit is if Skanska Concessionaire does not incur losses.  As such, Skanska SE has had an incentive to work adversely to SGL, and rather, for the benefit of Skanska Concessionaire and Skanska Parent.  Skanska SE's acting on this conflict of interest in favor of its affiliates breached Skanska SE's duty of loyalty to SGL and Lane.

67.     In particular, Skanska SE breached its duties of loyalty and care to Lane by refusing to consider pursuing and then failing to exercise SGL's legal rights to pursue termination of the Design-Build Agreement and Concession Agreement in order to benefit the financial, business reputation, and other interests of Skanska Concessionaire and Skanska Parent, even though Skanska SE understood that such refusal would result in substantial losses for SGL.

68.     Skanska SE also committed intentional misconduct, or at least was grossly negligent, in carrying out its duties to SGL and Lane when Skanska SE failed to identify its conflict of interest to SGL and Lane.

69.     In addition to failing to perform its fiduciary duties to SGL and Lane, Skanska SE failed to perform its obligations to its joint venture partners consistent with good faith by self-dealing by prioritizing the well-being of its sister affiliate and parent company.  Under Florida's RUPA, like partners in a partnership, joint venture members have the responsibility to "discharge their duties to the [joint venture] and the other partners under the act or under the [joint venture] agreement and exercise any rights consistently with the obligation of good faith and fair dealing."  Fla. Stat. Ann. § 620.8404(4).

70.     Skanska SE failed to act in good faith and was unfair and dishonest to SGL and Lane when Skanska SE refused to consider and neglected to pursue termination of the Design-Build Agreement and the Concession Agreement in order to protect its parent company and sister affiliate.

-17-

71.     Skanska SE intentionally failed to perform its duties to SGL and understood that its breach of its fiduciary duty had a high probability of damaging SGL.

72.     Skanska SE's breaches were performed in bad faith in that Skanska SE withheld information and resources from the members of SGL, that Skanska SE was otherwise obligated to provide, in order to cover up Skanska SE's malfeasance and to limit its own costs.

73.     As a direct and proximate result of Skanska SE's breach of its fiduciary duties, Lane, as a member of SGL, has suffered damages in an amount that, as of January 2021, exceeds $132,000,000 and continues to grow, including lost business opportunities, and incurred losses on the Project that were avoidable had Skanska SE not committed its breaches.

## COUNT TWO: GROSS NEGLIGENCE

74.     Lane repeats and realleges the paragraphs 1-61, as if fully set forth herein.

75.     As the managing partner, Skanska SE owed the duty of care to diligently and reasonably manage the affairs of SGL in the best interests of the joint venture and all of its partners, including Lane.  Instead, due to a conflicting interest in the success of I4MP, Skanska SE committed intentional, grossly negligent, willful and wanton misconduct, such that it managed its affairs in the best interests of itself and its owner to the detriment of the SGL as a whole and to SGL's non-managing members.  As a consequence, SGL has suffered and is continuing to suffer unnecessary and preventable losses.

76.     Skanska SE breached its duty of care by, among other things, failing to exercise SGL's legal rights to terminate the Design-Build Agreement and Concession Agreement.

77.     In the face of substantial losses and FDOT's refusal to provide sufficient compensation to eliminate the project losses, Skanska SE still refused to pursue termination in the interest of future concession profits and in the interest of avoiding potential liability that could be incurred by its sister affiliate as a result of termination.

78.     SGL's current and future losses on the Project are the direct and proximate result of Skanska's grossly negligent conduct.

## COUNT THREE: DECLARATORY JUDGMENT

79.     Lane repeats and realleges the paragraphs 1-61, as if fully set forth herein.

80.     Lane asserts this declaratory judgment cause of action pursuant to 28 U.S.C. §§ 2201, 2202 and rule 57 of the Federal Rules of Civil Procedure.

81.     As a consequence of Skanska SE's refusal to consider pursuing and then failing to exercise SGL's legal rights to pursue termination of the Design-Build Agreement and Concession Agreement, the project continues to incur losses.  Skanska SE is financing those losses through working capital calls requiring Lane and Granite to pay tens of millions each month to continue the Project.

82.     This month, Skanska SE seeks $21 million in capital from the joint venture partners, including $6.3 million from Lane.  By the end of 2021, it is expected that Skanska SE will ask the partners to contribute a total of $250 million in capital, with

Lane's portion being approximately $75 million.  It is also anticipated that Lane will be asked to contribute approximately another $5.1 million in 2022 in response to Skanska SE's working capital calls.

83.    These working capital calls are having a deleterious effect on Lane's financial position and causing substantial harm to Lane's business.  Lane can no longer afford to finance the Project so that Skanska SE's sister affiliate and parent can realize their profits.

84.    Since Skanska SE, as managing partner, has breached its fiduciary duties to SGL and Lane causing Lane to be subject to these working capital demands from Skanska SE, Lane is no longer obligated to make the working capital contributions.

85.    As a result, Lane is entitled to a declaratory judgment that Lane is not obligated to make any further working capital contributions to SGL.

**WHEREFORE**, The Lane Construction Corporation requests the following relief:

a.   A Declaration that Skanska breached its fiduciary duties to SGL and Lane and has been grossly negligent in performing its obligations to SGL.

b.   A Declaration that Lane is no longer required to make capital contributions or other payments to SGL or Skanska SE.

c.   An award of damages to Lane in an amount no less than $132,000,000.

d.   An award of costs and attorneys' fees in connection with this action.

-20-

e.  A judgment granting equitable relief in the form of restitution and

disgorgement.

f.  A judgment granting Lane such other and further relief as the Court deems

just and appropriate.

Dated: January 22, 2021

Respectfully submitted,


By: /s/ Shani Rivaux
Shani Rivaux (Trial Counsel)
FL Bar Number: 42095
Email: shani.rivaux@pillsburylaw.com
Jennifer G. Altman (Trial Counsel)
FL Bar Number: 881384
Email: jennifer.altman@pillsburylaw.com
**Pillsbury Winthrop Shaw Pittman LLP**
600 Brickell Avenue
Suite 3100
Miami, FL 33131
(786) 913-4900

Michael McNamara (Of Counsel)
DC Bar Number: 493773 (*pro hac vice
application forthcoming*)
Email: michael.mcnamara@pillsburylaw.com
Jeffrey Gans (Of Counsel)
DC Bar Number: 452332(*pro hac vice
application forthcoming*)
Email: jeffrey.gans@pillsburylaw.com
Gerald Zingone (Of Counsel)
DC Bar Number: 396604 (*pro hac vice
application forthcoming*)
Email: gerald.zingone@pillsburylaw.com
Brendan Hennessey (Of Counsel)
DC Bar Number: 1030821 (*pro hac vice
application forthcoming*)
Email: brendan.hennessey@pillsburylaw.com
PILLSBURY WINTHROP SHAW
PITTMAN LLP

1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8000

Denis L. Durkin (Of Counsel)
FL Bar Number: 237132
Primary Email: ddurkin@bakerlaw.com
Secondary email: psalemi@bakerlaw.com
orlbakerdocket@bakerlaw.com
BAKER & HOSTETLER LLP
2300 SunTrust Center
200 South Orange Avenue
Post Office Box 112
Orlando, FL 32802-0112
(407) 649-4000

*Attorneys for Plaintiff The Lane Construction Corporation*

# Exhibit 1

# JOINT VENTURE AGREEMENT

**THIS JOINT VENTURE AGREEMENT** (the "Agreement") was made and entered into, effective this _3rd_ day of _June_____, 2014, by and among the following Parties:

| PARTY | PRINCIPAL PLACE OF BUSINESS |
|---|---|
| **Skanska USA Civil Southeast** ("**Skanska**"), a Virginia corporation | **295 Bendix Road** **Virginia Beach, VA  23452** |
| **Granite Construction Company** ("**GCC**"), a California corporation | **585 West Beach Street** **Watsonville, CA 95076** |
| **The Lane Construction Corporation** ("**Lane**"), a Connecticut corporation | **90 Fieldstone Court** **Cheshire, CT 06410** |

**(individually, the "Party" and collectively, the "Parties")**

**WITNESSETH:**

      **WHEREAS**, the Parties are interested in submitting to I-4 Mobility Partners (the "Concessionaire") a design-build proposal (the "Proposal") to design and construct the I-4 Ultimate (the "Project") for the purpose of obtaining a contract from Florida Department of Transportation (the "Owner") for the Project. If the Concessionaire is awarded a contract with the Owner for the Project, the Parties intend to enter into a design/build contract with the Concessionaire.  The design and construction of the Project hereinafter is called the "Work" and the Design/Build Contract hereinafter is called the "Contract"); and

      **WHEREAS**, the Parties have agreed to form a joint venture to work together on an exclusive basis to submit the Proposal for and seek to obtain such Contract from the Concessionaire; and

      **WHEREAS**, the Parties desire to define and set forth their rights, obligations, and interests to each other in such joint venture, and to set forth their duties and obligations under the Contract which might be awarded as a result of the aforesaid Proposal;

      **NOW, THEREFORE,** in consideration of the premises and the mutual promises and agreements herein set forth, the Parties hereby agree to constitute themselves as a joint venture for the purpose of submitting a Proposal to the Concessionaire for the performance of the Contract and for the purpose of performing and completing the construction of the Project in the event that the Concessionaire is awarded a contract by the Owner for the Project, but not for any other purposes.  This Agreement contemplates only the furnishing and performance of the Work, labor and materials necessary for the submission of the Proposal and for the performance and completion of the Contract, and the Parties are not making any permanent agreement to develop or undertake any project other than the Project.   Nothing in this Agreement shall be construed as a limitation of the power or rights of any of the Parties to carry on their separate businesses for their sole benefit except, however, the Parties shall cooperate with each other according to the terms and spirit hereof in the performance and completion of the Contract pursuant to this Agreement.  The Parties agree that such Proposal and such Contract, if awarded to them, shall be performed and completed by them as a joint venture subject to the following terms and conditions:

## ARTICLE 1: FORMATION

**1.1**    **Name.**  The name of the joint venture shall be Skanska-Granite-Lane, a Joint Venture (referred to

herein as the "Joint Venture"), which shall be formed under the laws of the State of Florida, and the business of the Joint Venture shall be carried on under that name and under no other name.

**1.2    Registration.**  The Managing Party will file such documents with the State of Florida, as necessary, in order for the Joint Venture to qualify to do business in such state.

**1.3    Trade Name Affidavit.**  The Managing Party will file a trade name affidavit for the Joint Venture, if required by law, with the appropriate officials of any county or other jurisdiction in which the Joint Venture carries on business or in which any real property owned by the Joint Venture is located, promptly after the Joint Venture enters into the Contract.

**1.4    Principal Office.**  The Joint Venture's principal office will be that of its Managing Party and located at 295 Bendix Road, Suite 400, Virginia Beach, VA 23452.  Additional places of business may be established at such other locations as the Executive Committee determines from time to time.

**1.5    Term of Joint Venture.**  Unless otherwise specifically provided in this Agreement, or unless the term shall be extended by amendment to this Agreement, or unless the Joint Venture shall be sooner dissolved and its affairs wound up in accordance with this Agreement, the Agreement shall remain in full force and effect until all purposes for which the Joint Venture has been undertaken have been accomplished and completed.  In no event shall the Joint Venture be terminated until all rights and liabilities of this Agreement have been determined and satisfied.  However, this Agreement shall automatically expire and the Joint Venture will wind up its affairs when either the Owner officially gives notice that it will not award the Contract to the Concessionaire or the Joint Venture or Owner announces that it will award the Contract to a proposer other than the Concessionaire, after all protests related thereto have been resolved.

**1.6    Rebid.**  The Project shall include any rebid or request for proposal by the Owner of the Project or any other project of the Owner at the site of the Project which may incorporate in whole or part the work for which the Proposal was originally submitted whether or not the contract number or the terms of the contract vary from that of the Contract.  The obligations of the Parties with respect to such a rebid or further proposal shall survive what is elsewhere provided herein to be the termination of this Agreement.

**1.7    Joint and Several Liability.**  The obligations of the Parties under such Proposal and Contract shall be joint and several. Among themselves, the obligations and liabilities of the Parties shall be in accordance with this Agreement.

## ARTICLE 2: PROPOSAL AND BID BOND

**2.1    Bid Preparation.**  The Parties agree to jointly prepare a proposal for the design and construction of the Project ("Proposal") to be submitted to the Concessionaire and to any other governmental authority as may be required under the Request for Proposal documents on the official date specified for such submittal.  Should any Party fail to agree as to the form, terms, amount or conditions of the Proposal and notifies the Managing Party of that fact in writing at least sixty (60) days before the Proposal is submitted to the Concessionaire (except where such objection is based on the amount of the Proposal, in which case such objection is not limited in time), then, in such event, the Joint Venture and this Agreement shall terminate, subject to Article 2.2, below, and subject to the rights and obligations of the Parties accrued prior to such termination.  All Parties agree to negotiate in good faith toward finalization of a Proposal acceptable to all other Parties.

**2.2    Remaining Parties.**  If any Party notifies the Managing Party of its disagreement with the terms of the Proposal in accordance with Article 2.1 (the "Withdrawing Party"), and if the remaining Parties (the "Remaining Parties") agree to the terms of the Proposal, then said Remaining Parties may, upon the termination of the Joint Venture and this Agreement and subject to the approval of the Owner, form a new entity, with or without other participants, and submit the Proposal or another proposal for the Project. Neither the Withdrawing Party nor its affiliates may participate either directly or indirectly, as a prime contractor, subcontractor, or otherwise, in any contract, or in any proposal for any contract, for all or any portion of the Project.  The foregoing prohibition and all obligations which by their terms survive the

termination of this Agreement will survive the termination of the Joint Venture and this Agreement and Withdrawing Party shall continue to be bound by same.

**2.3     Exclusivity.**  Except as is provided in this Agreement, during the term of this Agreement none of the Parties shall, without the previous written consent of the others, directly or indirectly, in its own name or through a subsidiary, affiliate or parent company, as a prime contractor, subcontractor or otherwise, submit a proposal  for or take any interest for its own benefit in estimating the Work or in the execution or carrying out of the construction of the Project or any part thereof or any services preparatory thereto and each Party shall do all in its power to ensure the observance of this prohibition by all persons from time to time in its employment and all of its affiliates and subsidiaries or parent company.

**2.4     Pre-Submission Expenses.**  Except as is herein provided to the contrary:

    **(a)**     Each of the Parties shall assume its own expenses incurred prior to the submission of the Proposal; and

    **(b)**     No payment shall be made by the Joint Venture to any Party or to any third person in reimbursement of expenses incurred by such Party or third person in connection with the preparation of the Proposal, except third party consultants that the Parties have unanimously agreed to retain. The cost of such third party consultants shall be shared according to the Parties' Proportionate Shares.

**2.5     Proposal Bond and Stipend.**  If the Joint Venture is required to post a Proposal Bond or Bid Bond in connection with its Proposal for construction of the Project, each Party agrees to pay its Proportionate Share, as defined below, of the cost of any such bond required for the Project.   If successful, the cost of such bond, if any, shall be borne by the Joint Venture.  Should the Joint Venture be entitled to receipt of a stipend from the Owner in the event of an unsuccessful Proposal, the stipend shall first be used to pay third parties who the Parties unanimously agreed to retain pursuant to Article 2.4(b), above, and the balance shall promptly be distributed to the Parties in accordance with their Proportionate Shares.

**2.6     Contract Acceptance.**   If the Concessionaire's proposal is accepted by the Owner, or if the Parties are successful in negotiating the Contract subsequent to the submission of the Proposal, the Managing Party and the other Parties, on behalf of the Joint Venture, shall execute the Contract, and shall take such other steps as may be required to make the Contract a legal and binding agreement between the Joint Venture and the Concessionaire. Granite and Lane will execute a proper power-of-attorney authorizing the Managing Party to sign all Bid Documents other than the Contract.

**2.7     Parent Company Guarantees.**  Simultaneous with the execution of this Agreement, each of the Parties shall provide to the others a Parent Company Guaranty, in the form annexed hereto as Exhibit B, from each of their respective parent companies as follows:

| **PARTY** | **PARENT GUARANTOR** |
|---|---|
| Skanska USA Civil Southeast | Skanska USA Civil Inc. |
| Granite | Granite Construction Incorporated |
| Lane | Lane Industries Incorporated |

## ARTICLE 3:  PARTICIPATION OF PARTIES IN PROFITS AND LOSSES

**3.1     Parties' Proportionate Shares.**  Except as may be provided to the contrary in this Agreement, the interests of the Parties in any profits, losses and liabilities that may result from the performance of the Contract, or this Joint Venture, and their interests in all property, equipment and other assets acquired by the Joint Venture, and all monies received in connection with the performance of the Contract shall be as follows:

| PARTY | PROPORTIONATE SHARE |
|-------|---------------------|
| Skanska | 40% |
| Granite | 30% |
| Lane | 30% |

(the said percentage for each Party being herein called its "Proportionate Share").

Profits and losses of the Joint Venture shall be allocated to the Parties in accordance with their Proportionate Shares at the time of such allocations and the Parties' capital accounts shall be adjusted accordingly. A Party's capital account shall also be increased by any contribution to the Joint Venture's capital made by or on behalf of such Party and reduced by any distribution made to such Party. Notwithstanding the foregoing, a Party shall remain responsible for its original Proportionate Share of losses and liabilities.

If the Joint Venture is required to provide standby letters of credit or other liquid performance security, each Party shall provide its proportionate share of such liquid performance security.  If any Party is not able to provide such security according to its Proportionate Share, that Party's Proportionate Share shall be reduced to the percentage of the security it is able to provide and the other Parties' Proportionate Share shall be increased accordingly.   The Parties' Proportionate Shares as adjusted by this subparagraph shall become the "original Proportionate Share" wherever that term is used in this Agreement.

**3.2** **Losses, Liabilities Not To Exceed Proportionate Share.**  In the event of any losses arising out of the Joint Venture, or resulting from the submission of the Proposal (except those expenses incurred by any Party in connection with the preparation of the Proposal) and/or the performance of the Contract, posting or furnishing of bid or proposal bonds, or performance or payment bonds, or payment under the terms of such bonds, each Party shall assume and pay its Proportionate Share of such losses.  If, for any reason, any of the Parties incurs any liabilities or is required to pay any losses in excess of its Proportionate Share, the other Parties shall indemnify, hold harmless and shall reimburse such Party in such amount so that each Party will have paid its Proportionate Share thereof.   However, this indemnification obligation shall not relate to, and no other obligation of a Party assumed in this Agreement shall relate to or include, any incidental, indirect or consequential damages or  losses, expenses or liabilities (including, without limitation, loss of profit)  that may be sustained, suffered, assumed or incurred by any of the Parties. A Party shall not be entitled to indemnification for its own willful misconduct or bad faith.  Notwithstanding the foregoing, nothing in this Agreement is intended to limit or diminish any Party's rights or obligations set forth in any Cross Guaranty or Indemnification Agreement entered into between the Parties and any other parties, including any Party's parent company.

**3.3** **Each Party to Make Best Efforts.**  Each of the Parties agrees to make its best effort to place at the disposal of the Joint Venture, as requested by the Executive Committee, the benefit of all its experience, technical knowledge and skill and shall in all respects bear responsibility for the completion the Contract, including the provision of personnel, information, advice and assistance for the execution of the Work.

## ARTICLE 4: EXECUTIVE COMMITTEE

**4.1** **Composition of Executive Committee.**  To facilitate the handling of any and all matters and questions in connection with performance of the Contract, an Executive Committee is hereby established, comprised of one representative from each Party. Each Party hereby appoints the following primary representative and alternate to act for it in all such matters with full and complete authority to act on its behalf in relation to any and all matters and things in connection with, arising out of, or in relation to any and all matters, questions and things involving performance of the Contract.

CJV – I-4 Ultimate
Legal Rev. 31 MAY 2014

| PARTY | PRIMARY REPRESENTATIVE | ALTERNATE |
|---|---|---|
| Skanska | Sal Taddeo | Bob Rose |
| Granite | Michael Donnino | Dan Peter |
| Lane | Kirk Junco | Joe Lark |

A Party may from time to time change its appointed primary representative or alternate by filing with the other Parties a written notice in accordance with Article 23. The alternate representative shall serve only when the primary representative is absent or unable to serve.

**4.2    Executive Committee Meetings.** The designated representatives of the Parties constituting the Executive Committee shall meet quarterly or as requested by a Party or a member of the Executive Committee, subject to ten (10) days' notice, to act on matters within the mandate of the Executive Committee. Project Update Report shall be shared during such meetings which include Cost Reports and other reports outlined in Exhibit A. Such meetings shall be in person or by telephone conferencing. A resolution in writing, signed by all of the members of the Executive Committee shall be as valid as if it had been passed at a meeting of the Executive Committee. The Executive Committee will hold all meetings at the Project offices. Notice of future meetings of the Executive Committee so far as known will be given at each meeting. In addition, provided that advance written notice is given to the other Parties, any Party may have up to two (2) employees other than their respective Representatives attend meetings of the Executive Committee in a non-participatory and non-voting capacity. Upon the unanimous approval of all Parties, outside persons may be permitted to attend an Executive Committee meeting.

**4.3    Powers of the Executive Committee.**
(a) Decisions of the Executive Committee and decisions of the Parties must be unanimous. The Executive Committee shall have the power to make all decisions concerning the business of the Joint Venture except those otherwise delegated in this Agreement.

(b) If a unanimous vote or consent cannot be obtained for any matter and the Managing Party asserts in writing to the other Parties that it believes approval is critical in order for the Joint Venture to fulfill its obligations under the Contract, then the Managing Party may take such actions as it determines in good faith are reasonably necessary or appropriate to: (i) correct or address an emergency situation, such as, for example, a situation that threatens life, health, safety or property; (ii) comply with or avoid a material default or waiver of rights under the Contract; (iii) avoid partial or total suspension of the Work or delay in the Work schedule that might reasonably be expected to result in a failure to meet the milestone dates set forth in the Contract, including substantial completion and final acceptance; or (iv) avoid a material breach by the Joint Venture of any environmental or safety regulations; then, in such case, but only in such case, the Joint Venture and the Parties shall proceed and perform as directed by the Managing Party, including during any dispute resolution process, and each Party shall remain responsible for the performance, without delay or suspension, of its obligations under this Agreement. Any matters or disputes that are not resolved by unanimous vote, including any claims of a breach of this Agreement, shall be timely resolved in accordance with the Dispute Resolution Procedures contained in Article 19, except that any dispute regarding a Working Capital Call shall be decided in accordance with Article 7.

(c) Notwithstanding the provisions of subparagraph 4.3(b) above, the following decisions shall be made only by unanimous vote of the Executive Committee. If a unanimous vote is not obtained, the Joint Venture will be prohibited from taking action on such matters:

1.    Amending this Joint Venture Agreement;

2.    Admitting a new member of the Joint venture, or the sale, pledge, hypothecation or other transfer of all or any portion of a Party's interest in the Joint Venture; provided that any Party may transfer all or any portion of its interest in the Joint Venture to an affiliate with note to the other Parties, so long as the transferring Party agrees to remain fully liable for the transferee's performance of this Joint Venture and the affiliate agrees to abide by all the terms and conditions of this Agreement;

3.    Selling or transferring substantially all of the assets of the Joint Venture;

5

4.      Entering into any agreement for the borrowing or the loaning of funds by the Joint Venture;

5.      Granting any security interest in the assets of the Joint Venture to any third party, other than a surety company unanimously agreed on by the Parties;

6.      Providing any guaranty or indemnity in the name of the Joint Venture other than to the Concessionaire in accordance with the terms of the Design Build Contract;

7.      Entering into any agreement by the Joint Venture with a Party to this Agreement, or with an affiliate of any Party to this Agreement except as otherwise expressly provided for in this Agreement;

8.      Calling for a distribution of profits of the Joint Venture to the Parties.

**4.4     Meeting Minutes.**  All business transacted at meetings of the Executive Committee shall be recorded in suitable minutes by the Managing Party who shall use reasonable efforts to distribute such minutes to each Party for comment, correction and signed acceptance within two weeks after each Executive Committee meeting.

## ARTICLE 5: MANAGING PARTY

**5.1     Designation of Managing Party.**  Skanska is hereby designated as the Managing Party of the Joint Venture.  The Managing Party shall have charge and supervision over the timely and satisfactory performance of the Contract and the Work, subject, however, to the superior authority and control of the Executive Committee.   But, if the Parties cannot agree on any issue with respect to the performance of the Contract, the Work or this Agreement, the Managing Party shall have authority to direct performance thereof, pursuant to subparagraph 4.3(b), subject to the conditions contained therein.

**5.2     Management Fee.**  In addition to its Proportionate Share as described in subparagraph 3.1, Skanska, as the Managing Party, shall receive a Management Fee of one-half percent (**0.5%**) of the revenues as anticipated in the Proposal by the Joint Venture.  This Management Fee shall be paid monthly as the Joint Venture receives payment on the Contract. The Management Fee is considered compensation for the added expenses incurred by the Managing Party in performing its duties, and shall be an expense of the Joint Venture. Managing Party duties and responsibilities for which it will receive Management Fee are outlined in Exhibit A.

**5.3     Duties and Responsibilities.**
**(a)** The Managing Party shall act as liaison between the Project Manager and the Executive Committee .and shall provide advice and resources necessary to assist the Project Manager in carrying out the day-to-day responsibilities related to performance of the Contract.  The Project Manager shall also have authority to appoint and replace from time to time the various salaried and hourly personnel necessary to develop and operate the Work, and to negotiate, execute and deliver purchase orders, rental agreements, and subcontracts (not to exceed Two Million ($2,000,000.00) Dollars) and such other agreements with third parties other than a Party or Party's affiliates as are necessary and appropriate to carry out the Contract.  The Executive Committee must unanimously approve any third party contracts that exceed Two Million ($2,000,000.00) Dollars and any contract among the Joint Venture and a Party or a Party's affiliates.  The Project Manager shall not consent to any change to the scope of the Project or the Joint Venture's obligations under the contract with the Owner that exceeds Two Million ($2,000,000) Dollars, or which will result in a schedule delay to a controlling work item of more than [two] days, without the unanimous approval from the Executive Committee.

**(b)** The Managing Party also shall be responsible to establish a site project office and perform all Joint Venture business operations, including, but not limited to, payment of wages and accounts, and furnishing statements and reports concerning the financial status of the Joint Venture and progress of the Work as required by the Executive Committee.   The Managing Party shall furnish each of the Parties with regular monthly financial statements and cost reporting as further described in Exhibit "A" hereto,

6

calculated on the percent of completion basis and with such other financial reports and schedules as the Executive Committee or any Party may request.  The Managing Party, if requested by a Party, shall also arrange for a year-end financial audit to be performed by an independent accounting firm selected by the Executive Committee.

**5.4      Standard of Care.**   The Managing Party will not be liable to the Joint Venture or to any Party for any act or omission of it or of the Project Manager unless the Managing Party has engaged in gross negligence, willful misconduct or bad faith.

## ARTICLE 6: PROJECT MANAGER AND OTHER PROJECT PERSONNEL

**6.1      Project Manager.**  The Managing Party shall designate a Project Manager acceptable to the Executive Committee who shall serve at the Executive Committee's pleasure and be subject to its control. The Project Manager shall be delegated the responsibility for the practical execution and carrying out of the Work and the performance and completion of the Contract, and he shall have such specific powers as the Executive Committee or Managing Party may, from time to time, delegate. Project Manager's limit of authority shall not exceed Two Million ($2,000,000) Dollars without written approval from Executive Committee.

**6.2      Other Project Personnel.**  Each Party agrees that it shall supply and make available to the Project Manager such of its supervisory, managerial and other personnel as shall be required to successfully perform and complete the Contract, as determined by the Executive Committee and approximately in accordance with its Proportionate Share. Failure by a Party to contribute qualified supervisory, managerial or other personnel substantially in accordance with its Proportionate Share, after thirty (30) days written notice to cure from the Managing Party, shall be considered an act of default hereunder and a basis for reducing such defaulting Party's Proportionate Share of profits. Such personnel may remain in the employment of the particular Party supplying such personnel or may be employed by the Joint Venture, but, in either event, all such personnel shall cooperate with and serve under the authority of the Project Manager.  Costs of employment of such employees shall be reimbursed or paid to the providing Party upon terms to be established by the Executive Committee.  Hourly personnel and salaried personnel not available from the Parties hereto shall be hired by the Managing Party and paid for by the Joint Venture.  In the event that a Party defaults and the Joint Venture requires the services of any employee of the defaulting Party to complete the Project, then, subject to agreement of such employee, either the Joint Venture and/or any of the non-defaulting Parties may employ such employee(s) of the defaulting Party and the defaulting Party shall employ diligent efforts to assist the non-defaulting Parties with the transition of employees of the defaulting Party to the Joint Venture and/or non-defaulting Party as requested.

**6.3      Equipment Purchase or Rental.**  The Project Manager may purchase, rent or lease tools and equipment in the name of the Joint Venture (as limited by 6.1).  Any Party may lease its own tools and equipment to the Joint Venture, subject to approval by the Executive Committee.  The Project Manager will notify each Party of the need for leased equipment and will allow each Party a reasonable opportunity to lease equipment to the Joint Venture.  All resources necessary for the performance of the Contract, shall be purchased, hired or leased based upon rates established in the Joint Venture's cost estimate, or by way of competitive bidding and awarded to subcontractors, suppliers and/or subconsultants that submit the best offer in terms of price, payment terms, schedule, quality, guarantees and scope of work.

**6.4      Disposal.**  During the course of the Work and upon completion of the Work, the Project Manager will determine what plant, equipment, tools and salvageable materials belonging to the Joint Venture are no longer needed by the Joint Venture and will present a plan to the Executive Committee for their approval for the disposal of the assets.  Any Party who furnished major equipment, plant, or tools will be granted a right of first refusal with regard to reacquiring them.

**6.5      Standard of Care.**  The Project Manager will not be liable to the Joint Venture, or to any Party, in the absence of the Project Manager's gross negligence, willful misconduct or bad faith.

7

## ARTICLE 7:  WORKING CAPITAL

**7.1** **Working Capital Contributions.**  The term "Working Capital" shall mean those cash contributions which the Parties are required to provide to the Joint Venture to reasonably and necessarily meet its financial requirements.  Each Party will contribute Working Capital when and as required by a unanimous vote of the Executive Committee for the performance and completion of the Contract, in accordance with its Proportionate Share.  The need for Working Capital and the dates on which it is to be furnished shall be determined by the unanimous vote of Executive Committee (Working Capital Call) except when such determination is deemed warranted by the Managing Party based upon one or more of the grounds set forth in subdivisions (i) through (iv) of subparagraph 4.3(b) of this Agreement. Each such determination shall be final, binding and conclusive on the Parties except as provided in subparagraph 7.2.  The Managing Party shall use its best efforts to give written notice at least thirty (30) days prior to the date for payment thereof provided that the giving of less than thirty (30) days' notice shall not affect the obligation of the Parties to make the contribution on the date set for payment.  In no event shall the Managing Party provide less than ten (10) business days' notice requiring such contribution.  The Working Capital so provided and all other funds received by the Joint Venture shall be held in trust for disbursement under this Agreement, and for no other purpose.  Such funds shall be deposited in such banks, and may be withdrawn on such conditions, as are further set forth in this Agreement.  Those authorized to deal with funds of the Joint Venture shall be bonded in such amounts and by such companies as the Executive Committee shall determine.  Items of equipment, plant, and materials may be contributed in lieu of Working Capital, provided that any such contribution, and the value thereof, receives prior written approval of the Executive Committee.

**7.2** **Working Capital Call Disputes.**  If a Working Capital Call is made by the Managing Party in accordance with subdivisions (i) through (iv) of subparagraph 4.3(b) of this Agreement due to lack of unanimity of the Executive Committee, but a dissenting Party disputes the need for or the amount of the Working Capital Call, it may within ten (10) days of receipt of a Working Capital Call from the Managing Party, deliver a written notice to the Managing Party (who shall immediately deliver such notice to the Executive Committee) requiring the Executive Committee to select by majority vote and engage a certified public accountant (CPA) to conduct an independent review (at the dissenting Party's expense) to determine if the amount of the Working Capital Call is reasonably required to meet projected cash requirements for the performance of the Contract.  If the CPA finds that any or all of the Working Capital Call is  unreasonable to meet the projected needs to perform the Contract, the CPA may adjust the Working Capital Call amount by the amount it finds to be clearly unreasonable.  This shall be done within thirty (30) days of notice from the dissenting Party.  Pending resolution of a Working Capital Call dispute under this subparagraph 7.2, the dissenting Party and the other Parties shall continue to meet the Working Capital Call requirements within the time period set forth in subparagraph 7.1.  If there is any adjustment, it will be made by Proportionate Share and the Parties will get a refund or pay the difference, as the case may be, within thirty (30) days of written notice of the adjustment.

## ARTICLE 8:  WORKING CAPITAL CONTRIBUTION DEFAULTS

**8.1** **Party Default.**  Should any Party (the "Defaulting Party") be unable or fail or neglect to contribute its Proportionate Share of the Working Capital within fourteen (14) days after the date set for the contribution thereof by the Executive Committee in accordance with subparagraph 7.1, or by the Managing Party in accordance with subdivisions (i) through (iv) of subparagraph 4.3(b) of this Agreement, then:

    (a) the other Parties (the "Non-Defaulting Parties") may, at their option, pay the share of the Defaulting Party (the "Defaulting Party's Contribution"); and

    (b) The Joint Venture shall have an absolute right to recoup the amount of Working Capital the Defaulting Party failed to contribute from any amounts that may be due from Joint Venture to Defaulting Party pursuant to this Joint Venture Agreement or any other agreement among the Joint Venture and the Defaulting Party, or any judgment or judicial order in favor of the Defaulting Party.

8

**8.2     Non-Defaulting Party's Rights.**  If the Non-Defaulting Parties pay all or part of the Defaulting Party's Contribution, such payments shall be deemed to be demand loans made by the Non-Defaulting Parties to the Defaulting Party and are subject to the following conditions:

    **(c)**  Such loans shall be immediately repayable by the Defaulting Party without notice and shall bear interest at a rate per annum equal to three percent (3%) above the Prime Lending Rate, as defined below, determined on a day to day basis.  "Prime Lending Rate" means that rate declared from time to time by the JP Morgan Chase Bank of New York as being its prime lending rate for commercial loans.

    **(d)**  Such loans shall be and are hereby declared to be secured by a paramount lien and charge on the interest of the Defaulting Party in the Joint Venture, and the Defaulting Party shall and does hereby assign to the Non-Defaulting Parties its right to any payments from the Joint Venture as further security for such loans.  The Defaulting Party shall execute and deliver to the other Parties such documents as are reasonably necessary to perfect such lien including, without limitation, Security Agreement and Financing Statements.

    **(e)**  Partial payments in respect of such demand loan shall be applied first to accrued interest and second to reduction of principal.

    **(f)**  Each Non-Defaulting Party shall have the absolute right to set off the amount of Defaulting Party's Contribution contributed by that Party to the Joint Venture against amounts that Non-Defaulting Party may owe a Defaulting Party pursuant to any judgment, judicial order or any other agreement among them (including agreement's between their respective affiliates and subsidiaries)

**8.2     Adjustments to Proportionate Share in the Event of Default.**  For any period during which a Defaulting Party remains indebted to the Non-Defaulting Parties pursuant to subparagraph 8.1 hereof and without prejudice to the Non-Defaulting Parties' right to terminate under Article 16:

    **(a)**  The Proportionate Share of the Non-Defaulting Parties shall be increased to the proportion that their actual contributions to Working Capital (including loans therefore to the Defaulting Party) bear to the total contribution made to Working Capital by the Parties, and the Defaulting Party shall no longer have any right to participate in the management of the Joint Venture, and shall not have any vote on the Executive Committee; except that such Defaulting Party shall nevertheless remain obligated to fulfill all of its responsibilities in connection with the performance of the work, and to supply all required resources and personnel.

    **(b)**  But, the Defaulting Party shall remain liable for its <u>original</u> Proportionate Share of the losses and liabilities of the Joint Venture and for Working Capital contributions as required from time to time.

**8.3     Other Consequences of Default.**

    **(a)**  Whether or not the Non-Defaulting Parties elect to pay the Defaulting Party's required Working Capital contribution, the Non-Defaulting Parties, at their option, may terminate the Defaulting Party's interest in the Joint Venture, in accordance with Article 16.

    **(b)**  All Working Capital advanced on behalf of a Defaulting Party shall be repaid to the Party advancing the same prior to the distribution of any profits.  All repayments of Working Capital advanced shall be in the reverse order in which Working Capital was paid in.  In no event will repayment of any Working Capital or advance distribution of anticipated profit reduce the obligation of the Parties for future contributions of Working Capital or for losses of the Joint Venture.

    **(c)**  In the event that a Defaulting Party is indebted to the Non-Defaulting Parties pursuant to subparagraph 8.1 hereof, any monies otherwise payable to the Defaulting Party by the Joint Venture shall instead be paid to the Non-Defaulting Parties until the Non-Defaulting Parties have been paid in full.

**8.4     Defaulting Party Indemnification.**  In addition to the consequences set forth elsewhere in this Article 8, a Defaulting Party will indemnify and hold harmless the Joint Venture and the Non-Defaulting

9

Parties for any expense, loss, claims or liabilities including all legal fees, court costs, disbursements and expenses incurred as a result of the Defaulting Party's breach of its obligation to make Working Capital contributions.

**8.5**   **Non-Exclusive Remedies.**   The remedies in this Agreement for a breach by a Party of its obligation to make Working Capital contributions are in addition to and will not limit any other remedies in law or equity that the Non-Defaulting Parties or the Joint Venture may have.

## ARTICLE 9:  BANKING

**9.1**   **Establishment of Accounts.**   A bank account or accounts shall be opened in the name of the Joint Venture in such bank or banks under such description or descriptions as the Executive Committee may determine.  All Working Capital contributions made by the Parties, and all of the funds received by the Joint Venture or by any of the Parties on behalf of the Joint Venture in connection with the performance of the Contract, shall be deposited in such bank account.  Withdrawals may be made by check or draft or other instrument in such form as the Managing Party may from time to time direct.     All persons authorized to draw against the funds of the Joint Venture shall be bonded by their nominal employers in such amounts as the Executive Committee shall determine.  The premiums on any such bonds shall be paid by the Joint Venture.  No Party will unreasonably restrain and/or refuse to authorize withdrawal of funds for payment of proper expenses relating to the Work.

**9.2**   **Withdrawals and Payments.**    No payments shall be made or monies withdrawn from any such bank account except for the purposes of the Joint Venture.  Monies not immediately required for the purposes of the Joint Venture may be invested in securities or other investment in the name of the Joint Venture.  The Managing Party shall provide to the Executive Committee a listing of acceptable securities and investments subject to the unanimous approval of the Executive Committee.     Under no circumstances shall such securities or investments be stocks, bonds, or other instruments of debt and equity issued on behalf of any of the Parties or affiliated companies of the Parties.  No part of any funds deposited in any bank account of the Joint Venture shall be paid or returned to any of the Parties except as specified herein or as may otherwise be determined by the Executive Committee.

**9.3**   **Borrowing or Financing.**   No money shall be borrowed or financing arranged for the account of the Joint Venture, nor shall any assets of the Joint Venture be charged, assigned, mortgaged, pledged or hypothecated, unless unanimously approved by the Executive Committee.   If any monies are so borrowed, they shall be repaid in full prior to return of any Working Capital and distribution of gains or profits.

## ARTICLE 10:  ACCOUNTING

**10.1**   **Books and Records.**   The Joint Venture's fiscal year shall begin on January 1st and end on December 31st. Separate books of account of the Joint Venture and its operations shall be kept on the percentage of completion method by Joint Venture personnel and maintained at the office of the Joint Venture.  In addition to the requirements set forth in paragraph 5.3(b), financial Statements and other reports, as directed by the Executive Committee, of the financial condition of the Joint Venture, shall be made to each Party annually, no later than two months following the fiscal year end, or upon demand by the Executive Committee.   All records of the Joint Venture shall be open to examination and photocopying at any reasonable time by any of the Parties.  Such records and documents shall not be removed from the place where they are usually kept, without the previous consent of the Executive Committee.

**10.2**   **Audits.**   The Joint Venture books of account shall be GAAP (Generally Accepted Accounting Principles) compliant, and periodic audits, at least annually, based on a fiscal year, shall be made by an independent firm of accountants selected by the Executive Committee, and furnished to each Party no later than two months following the fiscal year end.  Upon completion of the Contract, if requested by the Executive Committee, there shall be a final audit of all accounts, records and other pertinent data and a

complete and final accounting shall be furnished to each Party for its approval and acceptance.

**10.3    Expenses.**  The cost of independent audits and the keeping and maintaining of the separate books of account during the course of the Work shall be a part of the cost of the Joint Venture.  To the extent records must be kept subsequent to the completion and acceptance by the Parties of the final accounting, they shall be kept at such place as the Parties shall determine and the cost thereof shall be borne by the Parties in accordance with their Proportionate Shares.

**10.4    Currency.**  The currency of the Joint Venture shall be United States of America (U.S.A.) dollars.

**10.5    Party's Financial Statements.**  During the term of this Agreement, each Party shall furnish annually to the others its audited financial statements and the audited financial statements of its parental guarantor if a parental guarantee has been furnished by a Party, or a statement of net worth where a personal guaranty has been furnished by a Party. The Parties agree that:

> (i)      each Party shall at all times maintain Cash and Cash Equivalents (as that term is used in FAS95) plus Long Term Marketable Securities and Credit Available Under Bank Facilities (hereinafter, "Cash, Securities, and Credit") in an amount not less than twenty million US dollars ($20,000,000) until December 31, 2014.  From December 31, 2014 to June 30, 2015, each Party shall at all times maintain Cash, Securities, and Credit in an amount not less than thirty million US dollars ($30,000,000). From June 30, 2015 and thereafter each Party shall at all times maintain Cash, Securities, and Credit in an amount not less than fifty million US dollars ($50,000,000).  Each Party will certify to every other Party, on a semi-annual basis, beginning on July 1, 2014, that it is in compliance with this part (i);

> (ii)     should ever the net worth (i.e., the equity of the company) of any Party or their respective parent companies (where applicable) decrease, or be impaired, by twenty-five percent (25%) or more during any calendar year, then the Party (or parent of the Party, as the case may be) with the decreased value shall, promptly upon notice of such diminution of value or upon notice of any incident or occurrence which in and of itself, or cumulatively with other incidents and/or occurrences, would create a reasonable likelihood of such diminution of value, send immediate written notification to the attention of the other Parties' respective Chief Financial Officers;

> (iii)    If a Party (the "Compromised Party") fails to maintain the liquidity provided for in (i) above, or the net worth be impaired or decreased as provided for in (ii) above, a meeting shall then be held within thirty (30) days of such notification, to be attended by the Chief Executive Officers and Chief Financial Officers of the Parties in order for the Compromised Party to provide adequate financial assurances to the other Parties of its ability to meet all contractual obligations of the Compromised Party.

> (iv)     If the Compromised Party is unable to re-establish the liquidity and net worth requirements provided for in (i) and (ii) or otherwise provide evidence of financial strength satisfactory to the other Parties within a reasonable period of time as agreed by the Parties, then the Managing Party shall determine the remedy appropriate to satisfy the fiduciary requirements of the Parties as established in this Agreement.  If the Managing Party is the Compromised Party, then the other, non-compromised Parties can determine the remedy.  Any dispute regarding the proposed remedy shall be subject to the Dispute Resolution process as set forth in Article 19 of this Agreement.  This provision is without prejudice to, and shall be read independent from, the Parties' other rights, remedies and duties under this Agreement.

## ARTICLE 11:  INSURANCE AND PERFORMANCE SECURITY

**11.1    Obtaining Insurance, Bonds and Other Performance Security.**  The Joint Venture shall obtain and maintain project specific insurance (separate from the Parties' own insurance programs unless the

Parties unanimously agree otherwise) on behalf of the Joint Venture and each of the Parties hereto as required by the Executive Committee or under the Contract including, without limiting the generality of the foregoing, liability insurance respecting the Work and insurance respecting fire and other perils on all tools, equipment and other assets of the Joint Venture. The type and amount of insurance shall be that set forth in the Contract. All Contract performance, payment and other bonds that may be required by the Joint Venture shall be obtained and maintained in the name of the Joint Venture. All Parties shall lend their best efforts to obtain any and all bonds and insurance required in connection with the Joint Venture. The Parties shall be jointly and severally liable on the bonds and each shall execute such indemnity agreements and other agreements as may be required by the companies writing the bonds. Nevertheless, among the Parties, the liability of each of them under the indemnity to the bonding companies shall be limited to their respective Proportionate Shares. If the Joint Venture is required to provide standby letters of credit or other liquid performance security pursuant to section 3.1, Parties' **Proportionate Shares**, the indemnity provided for at section 3.2, **Losses, Liabilities Not to Exceed Proportionate Share**, shall apply in case of demands thereon, replenishment thereof, and such additional security as may be required pursuant to the Contract.

**11.2    Premiums.** All premiums for bonds and insurance, and costs of standby letters of credit or other liquid performance security required on the Project and in the name of the Joint Venture shall be a direct cost to the Joint Venture.

**11.3    Insurance Broker.** The broker(s) for all insurances and payment and performance bonds required by the Joint Venture shall be determined by the Executive Committee.

## ARTICLE 12:  TREATMENT OF COSTS

**12.1    Reimbursable Costs.** Costs reimbursable to the Parties shall not include any costs or expenses incurred in the preparation and submitting of the Proposal, unless unanimously agreed in advance by all Parties. Reimbursable costs incurred by any of the Parties in the performance of the Contract or while directly engaged in the business of the Joint Venture shall be reimbursed by the Joint Venture to such Party provided prior approval of the Executive Committee has been received. Reimbursable costs shall be limited to:

(a)    The salary and all other employment-related expenses including, without limitation, benefits, payroll taxes and contributions for approved field personnel, which are not carried on the Joint Venture payroll, for the period of direct involvement in the Project;

(b)    All reasonable costs of travel, lodging, food, subsistence and such related miscellaneous expenses in accordance with the Party's company policies;

(c)    Compensation for services, plant, installed material and equipment rental provided by any of the Parties.

**12.2    Direct Job Costs.** All other direct job costs for field supervision, labor, materials, equipment, subcontractors, insurance, bonds, taxes, supplies, services, relocation costs and other expenses necessary for the performance of the Contract shall be incurred procured in the name of the Joint Venture and paid for directly by the Joint Venture.

**12.3    Billing Documentation.** Each Party shall submit to the Joint Venture, at least five (5) days before applications for payment are to be submitted by the Joint Venture to the Concessionaire under the Contract, documentation, showing amounts claimed due such Party for costs incurred to date. Such documentation shall be in such form as to enable the Joint Venture to meet any billing requirements of the Contract.

**12.4    Executive Committee and Management Expenses.** Salaries, costs and travel expenses of the members of the Executive Committee shall not be reimbursed to the Parties, nor shall salaries, costs and travel expenses of members of the management of the Parties not directly engaged in the business of the Joint Venture be reimbursed.

12

## ARTICLE 13:  TAXES

**13.1      General.**  Taxes and duties levied upon the Joint Venture as an entity, if any, shall be borne by the Joint Venture prior to the repayment of Working Capital or distribution of profits.  For income tax purposes, Federal, State, or otherwise, the Parties elect and agree that the Joint Venture shall not be taxed as an entity but each Party shall be taxed separately on its share of the profits of the Joint Venture. Each Party shall be separately responsible for any taxes levied on its receipts from the Joint Venture or otherwise incurred of whatsoever description, and shall indemnify the other Parties in respect of any liability therefore.

**13.2      Taxation as a Partnership.**  Neither the Joint Venture nor any Party will take any action which is inconsistent with treatment of the Joint Venture as a partnership for tax purposes.

**13.3      Tax Distributions.**  If not contrary to any Lien Law trust provisions, the Joint Venture will make tax cash distributions to the Parties to cover tax liabilities ("tax distributions") in accordance with the following provisions:

    **(a)**       The Joint Venture's internal accountants will make interim estimates of the Joint Venture's taxable income recognized during each Fiscal Year.  The Joint Venture's internal accountants will then determine the amount and timing of distributions required to provide the Parties with the cash needed to pay estimated income tax liability with respect to such income.  Estimated income tax liability for this purpose will take into account the character of such income (as capital gain or ordinary income) and the impact of any net operating losses from any prior Fiscal Year, and will otherwise be based upon a deemed maximum tax rate, which will be equal to the highest marginal rate for corporations for federal income tax or the highest marginal rate for individuals for federal income tax, whichever is applicable, plus an allowance of 5.5% for state corporate income tax.

    **(b)**       The Joint Venture will make estimated tax distributions in cash to the Parties with respect to the Joint Venture's taxable income allocated to them, based on each Party's Proportionate Share of the Joint Venture's taxable income determined under subsection (a) above.  If a net increase in the Joint Venture's taxable income is subsequently made because of a tax audit or settlement agreement, appropriate tax distributions will be made with respect to such net increase.

    **(c)**       All tax distributions will be treated as an allocation of profits.  No tax distributions will be made to any Party with respect to any period during which such Party was a Defaulting Party.

    **(d)**       Notwithstanding the foregoing provisions, the Executive Committee may reduce or eliminate any tax distribution to the extent that it reasonably determines that the Joint Venture requires such funds for Joint Venture operations.

**13.4      Tax Matters Partner.**  The Managing Party will be the "Tax Matters Partner" for federal income tax purposes.  The Managing Party shall prepare and file all Joint Venture tax returns and reports required under the law on the "percentage of completion" method for reporting income from construction work unless the law requires other methods.  Each Party shall be provided draft copies of the Joint Venture's annual Federal and State Partnership Returns, and all necessary financial records including the Joint Venture financial statements, not later than the first day of April of each year.  The Tax Matters Partner will provide the other Parties final Joint Venture tax returns necessary to prepare their own tax returns not later than the first day of May of each year.   The Tax Matters Partner's authority is limited such that it may not intentionally bind the other Parties to an audit, administrative adjustment, settlement agreement, a petition for review of a final partnership administrative adjustment or any change in the Joint Venture's returns as filed that will affect the Parties' tax liabilities without approval by the other Parties.

**13.5  Partnership for Tax Purposes.**  The Parties have formed the Joint Venture solely for the limited purpose of performing the Project. They intend to qualify as a partnership for tax purposes. Except as otherwise set forth in this Agreement, the Parties do not intend to be agents one to another, or partners as to any third party.  To the extent any Party, by word or deed, misrepresents to another person the

13

relationship of the Parties hereto, the Party making such wrongful representation shall be liable to any other Party if it incurs liability by reason of such wrongful representation.

## ARTICLE 14:  TOOLS, EQUIPMENT AND PERSONNEL

**14.1     General**.  All tools and equipment used in the Work shall be purchased, rented, or leased by the Joint Venture at competitive prices.  The Joint Venture may purchase, rent or lease such tools and/or equipment in the name of the Joint Venture. Any Party may rent its own tools and equipment to the Joint Venture providing that the terms of this Article are complied with.  The Project Manager shall notify the other Parties of the need for equipment and allow them the opportunity to furnish equipment to the Joint Venture.

**14.2     Executive Committee Approval**.  Equipment and/or plant to be furnished to the Joint Venture by the Parties shall require the prior written approval of the Executive Committee. Any such equipment furnished shall be in good working order when delivered to the jobsite.  The Joint Venture shall pay for all repairs and maintenance while the equipment is being used on the jobsite to maintain the equipment/plant in good working order.  Each Party shall have the option of inspecting such furnished equipment/plant to insure that it is in good working order.  On Party-furnished equipment and/or plant, the Joint Venture shall pay the cost of loading and freight to the jobsite, loading for return, and freight from the jobsite, provided the freight-out distance is no further than the freight-in distance.

**14.3     Disposition of Tools and  Equipment**.  During the course of the Work and upon completion of the Work, the Project Manager shall determine what part of the plant, equipment, tools and salvageable materials belonging to the Joint Venture is no longer needed for completion of the Contract, and shall dispose of the same in such manner, at such times and at such prices, as the Executive Committee shall determine.  In the event the Executive Committee is unable to unanimously agree to a manner, time and price for any such disposition, the plant, equipment, tools and salvageable materials so determined to be surplus shall be disposed of as follows:

**(a)**     The Parties shall employ, at the expense of the Joint Venture, two (2) qualified persons to jointly examine and appraise each such piece of plant, equipment, tools and salvageable materials.  A copy of the joint appraisal of the two persons selected shall be sent promptly to each Party.  Each Party shall have the right to notify the Joint Venture in writing within ten (10) days of the date of receipt of such appraisal, of which, if any, pieces of plant, equipment, tools and salvageable materials it wishes to purchase at the prices set forth in such appraisal.  If more than one Party notifies the Joint Venture of its desire to purchase any such piece of plant, equipment, tools or salvageable materials, they shall be awarded to the Party offering the highest price. Either Party having given such notice shall have the opportunity to increase its bid.

**(b)**     Any such piece of plant, equipment, tools or salvageable materials not disposed of pursuant to subparagraph (a) above may be sold by the Joint Venture at the appraised value thereof set forth in the appraisal referred to in subparagraph (a).

**(c)**     Any piece of plant, equipment, tools and salvageable materials not disposed of pursuant to subparagraphs (a) or (b), above, shall be distributed by the Executive Committee to the Parties as per their Proportionate Share using the appraised value referred to in subparagraph (a) above.

**(d)**     When a Party has acquired any equipment, etc., pursuant to this Article 14, it shall thereafter be responsible for its prompt removal and care.

**14.4     Personnel, Materials, Vehicles and Equipment Furnished to the Joint Venture.**   All personnel in the employ of any Party who perform any act on behalf of the Joint Venture shall be deemed to be performing work as employees or agents of the Joint Venture, whether such personnel are on the payroll of the Joint Venture or not, and the Joint Venture shall indemnify its Parties for claims by or concerning these personnel arising out of their performance of their scope of responsibilities under supervision of the Joint Venture. All materials, vehicles and equipment supplied by any Party to the Joint Venture shall be deemed to be the property of the Joint Venture with respect to any liability by or to

Parties for injury to property or persons as a result of the use of the materials, vehicles and equipment by or on behalf of the Joint Venture. However, the Joint Venture's liability with respect to vehicles and equipment furnished by the Parties for use by the Joint Venture shall be secondary to any insurance coverage maintained by the Parties for such vehicles and equipment to the extent payments to the furnishing party for such vehicles and equipment provide for party supplied insurance coverage. The provisions hereof shall apply without reference to the method of compensation of such Party by the Joint Venture, and the Joint Venture shall defend and indemnify each Party as provided herein from any claims, acts, suits, or liabilities against any Party brought by personnel, or by third parties, based on the use of personnel or property of such Party by or on behalf of the Joint Venture.

## ARTICLE 15: DISTRIBUTION OF ASSETS/LIABILITIES AND ACCOUNTING FOR LIABILITIES

**15.1    Periodic Distribution.**  It is the intention of the Parties that excess cash not necessary for the furtherance of the Work be distributed to the Parties. To that end, if not contrary to any Lien Law trust provisions or other law, if the Executive Committee unanimously determines, from time to time during the course of the Work, that excess funds or other assets held and acquired by the Joint Venture should be divided among or paid to the Parties in accordance with their Proportionate Shares, then the Executive Committee may direct the Managing Party to make distribution of such funds or other assets.

**15.2    Final Accounting.**  Upon completion of the Work, receipt of final payment under the Contract and all other accounts receivable including proceeds of the sale of all plant, equipment, tools and salvageable materials and other real or personal property sold in accordance with the provisions herein, and after paying or providing for payment of all known costs and expenses of the Joint Venture, and after repayment of all loans of the Joint Venture, and after reimbursing the Parties for costs as herein provided, and after setting aside such reserves for unsettled claims, demands and other contingencies as the Executive Committee may deem proper and advisable, the Executive Committee shall cause a final accounting to be prepared showing the total net profit earned or loss incurred by the Joint Venture. The audited books of account of the Joint Venture shall be conclusive in establishing whether a profit has been realized or a loss sustained and the amount of such profit or loss.

**15.3    Distribution of Profit.**  If such final accounting shall indicate that a net profit has been realized, such profit shall be distributed among the Parties in accordance with their Proportionate Shares as adjusted in accordance with the terms of this Agreement. When and if the monies set aside as reserves for the payment of unsettled claims and demands and other contingencies (including warranty obligations) are no longer required for the purposes intended, then such monies shall be similarly distributed among the Parties.  But, if not contrary to any Lien Law trust provisions, prior to the preparation of the final accounting referenced in subparagraph 15.2, the Executive Committee may release and distribute to the Parties, as per their adjusted Proportionate Shares, any such funds as the Executive Committee deems certain to be part of the net profit of the Joint Venture.

**15.4    Accounting for Losses.**  Losses incurred by the Joint Venture shall be allocated to the Parties in accordance with their original Proportionate Shares and their respective capital accounts shall be adjusted accordingly. If the performance of the Contract results in a loss, the Parties shall be obligated in accordance with their respective original Proportionate Shares, for any such loss. Such original Proportionate Share liability of each Party for the bearing of losses shall continue with respect to any claims which, at any time either before or after the completion of the Contract, shall be made by third parties arising out of or against the Joint Venture.

## ARTICLE 16: TERMINATION AND DEFAULTS

**16.1    Financial Defaults.**  If any Party (the "Defaulting Party") shall:

**(a)**     file, or fail to discharge, within thirty (30) days, an involuntary petition in bankruptcy or reorganization, or make a general assignment to its creditors;

**(b)**     become insolvent; or

**(c)**      have entered against it an order or be the subject of a resolution for the winding-up or other termination of its existence; or

**(d)**      have a liquidator, receiver or receiver-manager of its business be appointed;

then, unless prevented by law, the Defaulting Party's interest in the Joint Venture shall forthwith terminate.

**16.2     Performance-Related Defaults.**  If any Party (the "Defaulting Party") shall default in any of its material obligations under this Agreement including, without limiting the generality of the foregoing, refuse to provide an adequate number of Project personnel with the required technical knowledge and skill; fail to contribute its share of Working Capital (as provided for in Article 7); or commit any other material breach of this Agreement, then the other Parties (the "Non-Defaulting Parties") may jointly give written notice of termination to the Defaulting Party specifying the event of default or breach (the "Cure Notice").

**16.3     Opportunity to Cure Default.**  In the event that the Defaulting Party does not cure its default within seven (7) calendar days after receipt of the Cure Notice, the Defaulting Party's interest in the Joint Venture shall forthwith terminate.  Notwithstanding the foregoing, the Defaulting Party's interest in the Joint Venture shall not terminate, if the event of default specified in the Cure Notice is incapable of being cured within seven (7) days, and if the Defaulting Party timely commences to cure such default within seven (7) days after receipt of the Cure Notice and thereafter diligently and continuously proceeds to cure such default.  However, a default arising out of financial circumstances or a failure to pay moneys due, may not be cured after a date seven (7) days from receipt of the Cure Notice.

**16.4     Some Consequences of Termination of Defaulting Party's Interest.**  Upon termination of the Defaulting Party's interest in the Joint Venture:

**(a)**      the Non-Defaulting Parties may take over and complete the Work;

**(b)**      the Defaulting Party shall have no entitlement to share in any of the profits of the Joint Venture after the date of such default;

**(c)**      the Defaulting Party shall have no right to participate in the management or operation (except as required in subparagraph 8.2[a] of this Agreement) of the Joint Venture;

**(d)**      the Defaulting Party shall continue to be liable for all existing and future losses and liabilities of the Joint Venture including liabilities to the Non-Defaulting Parties for Working Capital under Article 8 hereof, in accordance with its original Proportionate Share; and

**(e)**      the Defaulting Party shall only be entitled to the return of its capital account upon completion of the Work and after payment of all liabilities due and owing from it to the Non-Defaulting Parties and to the Joint Venture.

**16.5     Indemnification.**  Upon the termination of the Defaulting Party's interest in the Joint Venture, it shall indemnify and hold harmless the Non-Defaulting Parties for any loss, claims or liabilities which the Non-Defaulting Parties may incur arising out of the default or breach of the Defaulting Party.  The Defaulting Party further agrees to pay all legal expenses incurred by the Non-Defaulting Parties to protect their interests, or defend any action arising out of the acts or failure to act of the Defaulting Party, or to enforce this Agreement, including court costs and disbursements and attorney's fees.

**16.6     Non-Exclusive Remedies.**  The remedies herein provided in this Article 16 shall be in addition to, and shall not limit, any remedies the Non-Defaulting Parties and/or the Joint Venture may have at law or in equity or otherwise.

16

## ARTICLE 17:  DISSOLUTION AND WINDING UP

**17.1     Dissolution.**  The Joint Venture shall be dissolved and its affairs wound up, upon the first to occur of the following events (Dissolution Events):

    **(a)**     the expiration of the term as provided in subparagraph 1.5 or elsewhere herein:

    **(b)**     the unanimous written consent of the Parties; or

    **(c)**     entry of a decree of judicial dissolution.

**17.2     Effect of Dissolution.**  Upon dissolution, the Joint Venture shall cease carrying on its business, except for the winding up of the Joint Venture's business, which shall continue until the winding up of the affairs of the Joint Venture is completed.

**17.3     Distribution of Assets on Dissolution.**  Upon the winding up of the Joint Venture, the Joint Venture property shall be distributed by the Executive Committee:

    **(a)**     to creditors, including Parties who are creditors, to the extent permitted by law, in satisfaction of the Joint Venture liabilities;

    **(b)**     in repayment of Working Capital to the Parties in accordance with their adjusted Proportionate Shares;

    **(c)**     to the Parties in accordance with their adjusted Proportionate Shares.

**.17.4     Deficit Capital Account.**  A deficit balance in a Party's capital account, after liquidation of the Joint Venture, shall be repaid by it to the Joint Venture no later than 90 days after the liquidation.

**17.5     Completion of Winding Up.**  The winding up of the Joint Venture shall be completed when all debts, liabilities, and obligations of the Joint Venture have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining property and assets of the Joint Venture have been distributed to the Parties.

## ARTICLE 18:  SUCCESSORS AND ASSIGNMENT

**18.1     Assignment.**  Each Party is entering into this Agreement in reliance upon the other Parties being and remaining Parties to this Agreement. No Party may assign, transfer, dispose of, pledge or hypothecate its interest, whether directly or by merger with or acquisition by another entity, or any part thereof, in the Joint Venture or in the Contract or in this Agreement or in any property or monies of the Joint Venture, except with prior written consent of the other Parties, and with the prior written consent of the Concessionaire if required by the Contract.  For purposes of this provision, a change of control of a Party shall constitute a prohibited assignment, transfer, disposition, pledge or hypothecation. "Change of control" of a Party is defined as: (i) a merger or consolidation of a Party in which the stockholders of said Party immediately prior to such transaction would own, in the aggregate, less than fifty percent (50%) of the total combined voting power of all classes of capital stock of the surviving entity normally entitled to vote for the election of directors of the surviving entity or (ii) the sale by a Party of all or substantially all said Party's assets in one transaction or in a series of related transactions.  In the event of such assignment, transfer, disposition, pledge, hypothecation or change of control by a Party without the prior written consent of the other Parties, said Party shall be deemed to be in default under this Agreement and the non-defaulting Parties may proceed in accordance with Article 16 of this Agreement.

**18.2     Void Dispositions.**  Any attempted disposition, transfer or assignment of a Party's Joint Venture interest, or any part thereof, not in compliance with this Article 18, is null and void and shall be a breach of this Agreement.

17

## ARTICLE 19:  DISPUTE RESOLUTION

**19.1      Negotiation.**  Any dispute or difference arising out of or relating to the Work or in connection with this Agreement shall, if not resolved by the Executive Committee, be resolved or compromised by good faith negotiation at the Chief Executive Officer level of the Parties.  The Parties may agree to use a professional mediator to conduct such negotiation, the cost of which is to be borne equally by all Parties, If, after the Parties have met at the Chief Executive Officer level on at least two separate occasions, the matter is not resolved, or if a Party refuses to negotiate, then the dispute or difference shall be determined in litigation.

**19.2      Litigation.**  Any dispute, or any controversy or claim arising out of or relating to this Agreement, or the breach thereof, which is not adjusted or disposed of by mutual agreement of the Parties, shall be determined in litigation, without a jury, exclusively in the state or federal courts of the State of Florida, in the City of Orlando.  The Parties agree to submit to the jurisdiction of the said courts and to accept service by nationally recognized overnight mail of any process issued in connection with such litigation, notwithstanding that said Party may then be located outside the jurisdiction of the said courts.

## ARTICLE 20:  INDEMNITY AND EXCULPATION

**20.1      Indemnity.**  As elsewhere provided herein, it is the intention of the Parties that all losses incurred by the Joint Venture shall be shared by the Parties in accordance with their original Proportionate Shares, whether or not such losses are caused or contributed to by any of the Parties hereto, the Managing Party, the Project Manager, the members of the Executive Committee or any of their respective directors, officers or employees except as provided in subparagraph 20.2.  Each Party shall indemnify and hold harmless the others from losses or expenses in excess of their Proportionate Share, subject to subparagraph 3.2.

**20.2      Exculpation.**  In connection with or in carrying out their duties or responsibilities assumed in this Agreement or under the Contract, neither the Parties, the Managing Party, the Project Manager, the members of the Executive Committee, nor their respective directors, officers, and employees, shall be liable to the Joint Venture or any of the Parties for their own acts or omissions, whether or not such acts or omissions were negligent, provided that such acts or omissions did not constitute gross negligence, intentional misconduct or were not committed in bad faith.

**20.3      Equitable Relief.**  The Parties agree that monetary damages would not be a sufficient remedy for a breach of this Agreement and that any Party that is not in breach of this Agreement shall be entitled to injunctive relief or other equitable relief to remedy or prevent any breach or threatened breach of this Agreement by a Party, which remedy shall not be the exclusive remedy for any such breach, but shall be in addition to all other rights and remedies available at law or in equity.

**20.4      Waiver of Consequential Damages.**  To the fullest extent permitted by law, no Party or its parents, subsidiaries or Affiliates or any of their shareholders, officers, directors, agents or employees shall be liable to the other Parties or their respective Affiliates or subsidiaries or their shareholders, officers, directors, agents or employees, for any special, indirect, consequential, incidental, exemplary, or punitive damages (which will be interpreted to include without limiting the generality of the foregoing any loss of opportunity, chance, profit or revenue (other than profit or revenue of this Joint Venture that otherwise would be recoverable from the other Parties under this Agreement) loss of use; loss of opportunity; or increased cost of capital) arising out of or in connection with this Agreement.

## ARTICLE 21:  GOVERNING LAW

**21.      Governing Law.**  The interpretation of this Agreement and the determination of any and all disputes arising out of or relating to this Agreement, or the enforcement thereof, shall in be in accordance with the laws of the State of Florida.

18

## ARTICLE 22:  LEGAL COUNSEL

**22.1    General.**  The Joint Venture, subject to the approval of the Executive Committee, shall retain legal counsel for use in connection with any matters of concern to the Joint Venture which may require legal counsel or assistance, as determined by the Executive Committee.  To the greatest extent permitted by law, subject to the right of an individual Party to decide not to so waive a conflict in the context of a particular matter not concerning the Joint Venture, the Parties hereby waive any conflict in such joint representation. The expense of legal counsel shall be borne by the Joint Venture. The Parties and/or the Joint Venture shall be represented jointly by one attorney or firm in any legal claim, proceeding or lawsuit (each a "Proceeding") throughout the pendency of the Proceeding and shall jointly assume defense of the Joint Venture.  This Agreement shall automatically apply to substitute or associated counsel who may appear in the Proceeding on behalf of any of the Parties. This Agreement covers, applies to, and binds the firms, partners, associates and support staff of said counsel, as well as any consultants, investigators, or experts retained by them in connection with the defense of the Proceeding

**22.2    The Client.**  Such legal counsel shall represent the Joint Venture and shall not represent the individual interest of any Party relating to the Joint Venture, the Contract, the Work or this Agreement without the consent of the other Parties.  If separate counsel is required to represent the interests of any Party, such Party shall be solely responsible for selecting and compensating its legal counsel.

**22.3    Joint Defense and Prosecution of Claims.**  Should one or more of the Parties, or the Joint Venture entity itself, become a party to a legal claim, proceeding or lawsuit (each a "Proceeding"), whether offensive or defensive, involving or relating to the subject matter of this Agreement or the Project, other than a Proceeding solely between or among the Parties, the Parties agree that they have a mutual interest in proceeding together in  a common defense or prosecution and to enter into a Joint Defense Agreement.  Should one of the Parties be subject to a Proceeding unrelated to the business of the Joint Venture, the provisions of this Article shall not apply. Without waiving their individual attorney  client privilege, work product or any other privilege or immunity, except as provided herein, and always subject to the right of a Party to withdraw as provided in paragraph 22.3(c) the  Parties agree to enter into a Joint Defense Agreement with the following terms:

(a) The Parties agree to share and exchange among themselves, witness statements, factual summaries, documents, legal strategies, intelligence, confidences, and other secrets (hereinafter the "Joint Defense Materials") for the limited and restricted purpose of assisting counsel in protecting the common rights and interests of the Parties.  Any communications or Joint Defense Materials shared between the Parties are within the "common interest" and are, therefore, confidential and protected from disclosure to any third party by the attorney-client privilege and the work product doctrine and may be used for no other purpose than the common interest of the Parties. All Joint Defense Materials (including all copies, summaries or excerpts thereof) shall be returned to the Party who provided at the conclusion of the Proceeding.

(b) None of the privileged or otherwise protected communications or Joint Defense Materials obtained by either Party or information derived therefrom shall be disclosed or revealed to any third party except a) as required by law or an order of a court of competent jurisdiction or b) with the written consent of all Parties.  Should one Party receive a subpoena or process requiring production of Joint Defense Materials, it shall provide five (5) days written notice to the other Party to give it an opportunity to move for a protective order.

(c) Should a divergence of interest between the Parties arise during the Proceeding, any Party may withdraw from the Joint Defense Agreement. The attorney representing the Parties may not represent either Party in a claim against one another nor appear as a witness in any such claim without the advance, express, written consent of the other Parties.  No Party shall object to a motion by another Party to intervene in a pending Proceeding.

(d) The Parties agree that this Agreement may be enforced by injunctive relief and that it shall not be subject to abrogation by an assignee, trustee in bankruptcy or other successor in interest to any Party

19

hereto.  Nor shall such assignee, trustee in bankruptcy or other successor in interest waive any privilege or immunity with regard to the Joint Defense Materials shared by or among the parties to this Agreement.

(e)  Notwithstanding anything in this Agreement to the contrary, any Party withdrawing from the Joint Defense Agreement shall continue to be bound by subparagraphs 22.3(a) and (b).

## ARTICLE 23:  NOTICE

**23.1**   **Method of Notice**.  Any demand, notice or other communication to be given to the Joint Venture in connection with this Agreement or to be otherwise given under this Agreement shall be given in writing and shall be given by personal delivery, by overnight mail, postage prepaid, or by fax addressed to the recipients as follows:

| ENTITY | | ADDRESS |
|---|---|---|
| a) | **TO: Joint Venture**<br>Jon Walker | 111 N. Magnolia Ave, Ste 1150, Orlando, FL 32801<br>Fax #:  407-872-0962 |
| b) | **TO: Skanska**<br>Sal Taddeo | 295 Bendix Road, Ste 400, Virginia Beach, VA 23452<br>Fax #: 757-420-4089 |
| c) | **TO: Granite**<br>General Counsel | 585 West Beach Street, Watsonville, CA 95076<br>Fax #: (831) 761-7846 |
| d) | **TO: Lane**<br>General Counsel | 90 Fieldstone Court Cheshire, CT. 06410<br>Fax #: 203-439-2998 |

**23.2**   **Effective Date of Notice.**  Any communication given by personal delivery or by overnight mail shall be conclusively deemed to have been given on the day of actual delivery thereof; or if given by fax, on the day of confirmed transmittal thereof.

## ARTICLE 24:  OWNERSHIP AND USE OF DOCUMENTS

**24.1**   **General.**  Intellectual property and instruments of service prepared for the Project shall remain the property of the contributing Party.  No other Party shall use or reproduce such documents for its own benefit without the written consent of the contributing Party.  The contributing Party shall retain its common law and statutory rights in such documents; however, the non-contributing Parties shall have a perpetual, non-exclusive license to continue to use, and authorize others to use, such documents as necessary to perform the Work of the Joint Venture, subject to the obligation of confidentiality set forth in Article 24.3, below.

**24.2**   **Publicity.**  Unless required by law, no Party will release any advertisement, press release or public statement which involves another Party or the Joint Venture without Executive Committee approval.

**24.3**   **Confidentiality.**  To the extent of their respective rights and abilities to do so, the Parties shall exchange such information and data as are reasonably required of each to perform its obligations under this Agreement and the Contract.  All technical information, information systems and confidential business information which is received by a party (the "Receiving Party") from another Party (the "Transmitting Party") under this Agreement and identified in writing as confidential or proprietary, whether in hard copy or electronic form, ("Confidential Data") shall not be disclosed to other persons except as provided herein.  Confidential Data may be disclosed, on a "need to know" basis, (i) to an employee of a Receiving Party or its Affiliates and (ii) subject to a confidentiality agreement, to a subcontractor or supplier or prospective subcontractor or supplier.  The restrictions on the disclosure of Confidential Data shall not apply to the extent such data (a) were in the public domain at the time of disclosure or later came under the public

20

domain, (b) were known to the Receiving Party at the time of the disclosure, (c) are authorized for disclosure by the written approval of the Transmitting Party, (d) are not unlawfully derived by the Receiving Party from a source other than the Transmitting Party without restriction as to the use or disclosure of the data, or (e) are independently developed by the Receiving Party without recourse to any Confidential Data provided under this Agreement.  The Parties shall not be restricted in any way from releasing information in response to a subpoena, court order or legal process, but shall notify the Transmitting Party of the demand for information before responding to such demand.  Notwithstanding anything to the contrary herein, the Parties shall strictly adhere to the confidentiality requirements set forth in the Contract and in any separate Confidentiality or Non-Disclosure Agreement entered into in connection with the Proposal or Contract. The foregoing restrictions shall cease to apply two years after the termination of this Agreement or such longer period set forth in the Contract.

### ARTICLE 25:   MISCELLANEOUS

**25.1   Interpretation.**  The captions and headings used herein are for convenience and reference only and shall not limit or expand, or be referred to in interpreting or construing, the provisions hereof. Whenever the singular or masculine or neuter is used in this Agreement, the same shall be construed as meaning the plural or feminine or body politic or corporate and vice versa where the context so requires.

**25.2   Further Assurances.**  Each Party shall from time to time execute and deliver all such further documents and instruments and do all acts and things as the Joint Venture or other Parties may reasonably require to effectively carry out ,better evidence, or perfect the full intent and meaning of this Agreement.

**25.3   Time of the Essence.**  Time shall be of the essence of this Agreement.

**25.4   Unenforceability.**  Unenforceability of any part of this Agreement shall affect that part of this Agreement only and the rest of this Agreement shall remain in force and unaffected.

**25.5   Entire Agreement.**  This Agreement constitutes the entire agreement among the Parties in regard to the subject matter hereof, and it supersedes and is not subject to any other oral or written proposals, agreements or understandings whatsoever, and may only be subsequently supplemented or amended by a written agreement subscribed by the Parties.

**25.6   Counterparts.**  The Agreement may be executed in any number of counterparts, each of which shall be deemed an original and together shall constitute but a single instrument.

**25.7   Limitation on Third-Party Beneficiaries.**  It is not intended by any of the provisions of this Agreement to create any third party beneficiary hereunder or to authorize anyone not a Party hereto to maintain a suit for damage pursuant to the terms or provisions hereof.

**IN WITNESS WHEREOF** the Parties hereto have executed this Agreement:

**SKANSKA USA CIVIL SOUTHEAST INC.**

By:

Title:     Salvatore Taddeo
           Executive Vice President

Date:      6/3/2014

21

**GRANITE CONSTRUCTION COMPANY**

By: _____

Michael Donnino

Title:      Senior Vice President

Date: _____

**THE LANE CONSTRUCTION CORPORATION**

By: _____

Kirk D Junco

Title:      Chief Operating Officer and Executive Vice President

Date: _____

**GRANITE CONSTRUCTION COMPANY**

By: _____

             Michael Donnino

Title:      Senior Vice President

Date: _____

**THE LANE CONSTRUCTION CORPORATION**

By: _____

             Kirk D Junco

Title:      Chief Operating Officer and Executive Vice President

Date:     June 2, 2014 _____

**EXHIBIT A**
**DIVISION OF SERVICES AND COSTS**

| DESCRIPTION | PARTIES COST NON-REIMBURSABLE FROM JOINT VENTURE | COVERED BY MANAGEMENT FEE | JOINT VENTURE COST |
|---|---|---|---|
| 1.   Salaries and Burdens | | | |
|    i)   Pre- Bid/Proposal | | | |
|       ☐   All pre-Bid/Proposal salaries and burdens | X | | |
|       Third Party Costs | | | X |
|    ii)   Pre-Award | | | |
|       ☐   Managing Party's salaries and burdens | X | | |
|       Third Party Costs | | | X |
|    iii)   Post-Award | | | |
|       ☐   Managing Party's Head Office Executives | | X | |
|       ☐   Project Manager | | | X |
|       ☐   On-site head office operations personnel requested by Project Manager | | | X |
|       ☐   Managing Party's Head Office Equipment Manager | | X | |
|       ☐   JV's Equipment Manager | | | X |
|       ☐   Managing Party's Head Office Purchasing Agent | | X | |
|       ☐   JV's Purchasing Agent | | | X |
|       ☐   Managing Party's Head Office Labor Relations | | X | |

| DESCRIPTION | PARTIES COST NON-REIMBURSABLE FROM JOINT VENTURE | COVERED BY MANAGEMENT FEE | JOINT VENTURE COST |
|---|---|---|---|
| Manager | | | |
| ☐ Managing Party's Head Office Administration Manager | | X | |
| ☐ Managing Party's Head Office Human Resources | | X | |
| ☐ JV's Personnel Department | | | X |
| ☐ Managing Party's Head Office Safety Personnel | | X | |
| ☐ JV's Safety Personnel | | | X |
| ☐ Managing Party's Head Office Information Systems | | *X See exception Item 5 (ii) | |
| ☐ JV's Information Systems Personnel | | | X |
| ☐ All staff hired or assigned to Joint Venture and located on-site or in the Head Office for training or prior to site office set up | | | X |
| ☐ Managing Party's Head Office Accounting and Payroll Personnel when business system is on-site | | X | |

| DESCRIPTION | PARTIES COST NON-REIMBURSABLE FROM JOINT VENTURE | COVERED BY MANAGEMENT FEE | JOINT VENTURE COST |
|---|---|---|---|
| ☐ Managing Party's Head Office Accounting and Payroll Personnel when business system is in Head Office and the Head Office is performing Joint Venture accounting and payroll functions | | | X |
| ☐ Managing Party's or JV Partner's Head Office Personnel when performing a specific project assignment at the request of the Project Manager | | | X |
| ☐ Statutory burdens | Allocated with salaried cost | | |
| ☐ Site allowances | Allocated with salaried cost | | |
| ☐ Vehicle/car allowances | Allocated with salaried cost | | |
| 2. Travel and Accommodation (including room and board) | Allocated with salary cost above. Only exception is when one of the above is required to travel for selection of equipment or to review a procedure used elsewhere that has application for the project. When this is done at the request of the Project Manager, the travel and accommodations are a Joint Venture cost. | | |
| 3. Personnel Placement Fees | | | X |
| 4. Moving Expenses | | | X |
| 5. Data Processing | | | |
| i) Hardware | | | |
| ☐ In Head Office | | X | |
| ☐ On-site | | | X |
| ☐ Third party | | | X |

I-4 Ultimate
Legal Rev. 1-22-13

| DESCRIPTION | PARTIES COST NON-REIMBURSABLE FROM JOINT VENTURE | COVERED BY MANAGEMENT FEE | JOINT VENTURE COST |
|---|---|---|---|
| modifications to either Head Office or on-site equipment necessitated by project requirements | | | |
| ii)  Software | | | |
| ☐   In Head Office | | X | |
| ☐   On-site | | | X |
| ☐   Modifications to either Head Office or on-site software necessitated by project requirements including in-house programming expense | | | X |
| iii)  Communications (including modem line, gateway and third party hook-up expense) | | | X |
| ☐   When using all or part of Head Office business system | | X | |
| ☐   When business system is on-site | | | X |
| ☐   Other communication requirements of Joint Venture (i.e., third party support modems, etc.) | | | X |

4

| DESCRIPTION | PARTIES COST NON-REIMBURSABLE FROM JOINT VENTURE | COVERED BY MANAGEMENT FEE | JOINT VENTURE COST |
|---|---|---|---|
| iv)  Training | | | |
| ☐  Managing Party's home office personnel who provide training and support | | X | |
| ☐  Third party Project training and support and expenses | | | X |
| 6.  Estimating Expenses | | | |
| ☐  Pre-Award | X | | |
| ☐  Post-Award/On site | | | X |
| 7.  Engineering Expenses | | | |
| ☐  Pre-Award (In House) | X | | |
| ☐  Third Party | | | X |
| ☐  Post-Award including Managing Party's in-house Head Office engineering expense assigned to Project (subject to JV approval). | | | X |
| 8.  Project Controls | | | |
| ~  Head Office | | X | |
| ~  On Site | | | X |
| 9.  Scheduling Expenses | | | |
| ☐  Pre-Award | X | | |
| ☐  Post-Award | | | X |
| 10.  Licensing and Registration Fees | | | |
| ☐  Pre-Award | X | | |

I-4 Ultimate
Legal Rev. 1-22-13

| DESCRIPTION | PARTIES COST NON-REIMBURSABLE FROM JOINT VENTURE | COVERED BY MANAGEMENT FEE | JOINT VENTURE COST |
|---|---|---|---|
| ☐   Post-Award | | | X |
| 11.  Legal Expenses | | | |
| In House Counsel –  General advice | | X | |
| Significant claims, complaints, and legal issues including 3rd party legal expenses (Subject to JV approval). | | | X |
| 12.  Insurance and Bonding | | | X |
| 13.  Payroll Services (this does not include the direct payroll expense, only the cost of generating the payroll) | | | |
| ☐   Salaried personnel (If on site) | X | | |
| ☐   Hourly and salaried personnel on JV payroll | | | *X<br><br>Further defined in Item 1 (iii) |
| 14.  Accounting Services (If on site) | | | *X<br><br>Further defined in Item 1 (iii) |
| 15.  Miscellaneous Office Supplies | | | |
| i)   Supplies shipped to job from inventory | | | X |
| ii)   Joint Venture stationary, business cards, checks, etc. | | | X |
| iii)   Courier expenses | | | |
| ☐   Originating on job site or from third parties to job site | | | X |
| ☐   Originating in Managing | | X | |

I-4 Ultimate
Legal Rev. 1-22-13

| DESCRIPTION | PARTIES COST NON-REIMBURSABLE FROM JOINT VENTURE | COVERED BY MANAGEMENT FEE | JOINT VENTURE COST |
|---|---|---|---|
| Party's Head Office | | | |
| iv)  Long distance | | | |
| ☐   Originating on job site | | | X |
| ☐   Originating in Managing Party's Head Office | | X | |
| v)   Bank charges | | | |
| ☐   Joint Venture bank accounts | | | X |
| vi)  Office space | | | |
| ☐   Pre-Award  (Use of existing facilities) | X | | |
| ☐   Managing Partner's head office | | X | |
| ☐   Project related third party landlord or trailer expenses | | | X |
| vii) Copying charges | | | |
| ☐   Managing Partner head office copy charges | | X | |
| ☐   Third party Project copy charges | | | X |
| ☐   On-site copy charges | | | X |

7

**EXHIBIT A (CONTINUED).**

**INFORMATION, SERVICES OF MANAGING PARTY'S HEAD OFFICE**

The foregoing Table outlines the services to be provided by the Managing Party in return for the Management Fee.  This narrative is intended to provide details on the nature and scope of those services.

1.      Salaries & Burdens

Pre-Award:

After formal notification by the Owner of their intent to award the Project to the Joint Venture, all salaries and burdens of the Managing Party's personnel who may be involved in negotiations with the Owner will be covered by the Management Fee.  The only exception to this would be if the Executive Committee determined it was in the Joint Venture's interest to establish the Project team and begin detailed project planning.  In that event, and with approval of the Executive Committee the costs would be a Joint Venture cost.

Post-Award:

Head Office executives of the Managing Party will, in general, offer support and assistance to the Project Manager and staff regarding the due performance of the Project and the Contract subject to the superior authority of the Executive Committee.  More specifically their involvement will include, but is not limited to the following:

a)      Providing preliminary advice on technical and construction matters as well as on contractual issues prior to obtaining legal advice,

b)      Providing advice on union or labor issues, and

c)      Monitoring the performance of the Project Manager to ensure any critical contractual or financial issues are communicated to the Executive Committee without delay.

The Head Office Equipment Manager will provide advice, support and assistance to the Joint Venture Equipment Manager on the following:

a)      Selection and acquisition of plant, equipment and tools,

b)      Establishment of a preventative maintenance program (including record keeping and costing) for all plant, equipment and tools,

c)      Negotiation with plant and equipment suppliers on warranty issues, and

d)      Other matters relating to management of Joint Venture plant and equipment.

The Head Office Purchasing Agent will provide advice, support and assistance to the Joint Venture Purchasing Agent on the following:

8

a)      Selection of subcontractors and suppliers,

b)      Negotiating and preparing purchase orders and subcontract agreements,

c)      Establishment of a program to track and monitor minority suppliers and subcontractors to ensure compliance with the Contract, and

d)      Other matters relating to management of suppliers and subcontracts.

The Head Office Labor Relations will provide advice, support and assistance to the Joint Venture Labor Relations on the following:

a)      Discussions and negotiations with the various trade unions at Project start-up,

b)      Negotiations and settlement of labor disputes which may arise during the course of the Project and,

c)      Other matters relating to labor relations.

The Head Office Administration Manager will provide advice, support and assistance to the Joint Venture Administration Manager on the following:

a)      Establishment and operation of the business system for all Project accounting functions (payroll, accounts payable, banking, tax accounts, receivables),

b)      Ensuring all payroll, taxation and accounting practices are in compliance with statutory requirements,

c)      Ensuring that Bonds and Guarantees are released at the earliest possible time for the benefit of the Joint Venture,

d)      Establishment and operation of banking facilities in the name of the Joint Venture as approved by the Executive Committee,

e)      Obtaining and maintaining all required insurance coverage as approved by the Executive Committee, as well as handling insurance claims,

f)      Controlling the investment of surplus funds as approved by the Executive Committee,

g)      Ensuring that all project records are maintained and retained to comply with any statutory requirements,

h)      Selecting and coordinating with an external auditor as and when requested by the Executive Committee and,

A.      Other matters relating to the administration of the Contract and the business of the Joint Venture.

The Head Office Safety Personnel will provide support and assistance to the Joint Venture Safety Personnel on the following:

a) Preparation of the Project Safety and Loss Control Program,

b) Monitoring safety and loss control performance to ensure compliance with Contract or statutory requirements and,

b) Other matters relating to safety and loss control.

The Head Office Information Systems will provide advice, support and assistance to the Joint Venture Information Systems Personnel on the following:

a) To determine the system requirements, selection of hardware and software to operate the system and installation of the system,

b) Troubleshooting system problems, and

c) Other matters relating to selection, installation and operation of information system

10

I-4 Ultimate
Legal Rev. 1-22-13

Exhibit B

**GUARANTEE**

**THIS GUARANTEE** ("Guarantee") is made and entered into as of the [INSERT DATE], by **[INSERT PARENT COMPANY]** ("Guarantor") for the benefit of **[INSERT NAME OF BENEFICIARY]** ("Beneficiary").

**WHEREAS,** Guarantor is the parent company of [SUBSIDIARY];

**WHEREAS,** Beneficiary has entered into that certain Joint Venture Agreement dated as of [INSERT DATE] by and between Beneficiary, [SUBSIDIARY] and [OTHER JV MEMBER] (the "JV Agreement"), which JV Agreement is by reference made a part hereof as though set forth in full;

**WHEREAS** the joint venture has entered into a contract dated as of [INSERT DATE] with an entity known as the [INSERT DEVELOPER/OWNER ENTITY] to perform certain [design and construction] services in connection with the project known as the [INSERT PROJECT DESCRIPTION] (the "Project");.

**WHEREAS,** pursuant to the terms of the JV Agreement, each member of the joint venture has agreed to provide a parent company guarantee to each of the other members whereby its designated parent company will unconditionally guarantee all of that members obligations arising under the JV Agreement;

**NOW THEREFORE,** in consideration of the mutual promises set forth herein, Beneficiary's entering into the JV Agreement with [SUBSIDIARY], and such other good and valuable consideration, the receipt and sufficiency of which is acknowledged herein, the Parties hereto agree as follows:

1.    Guarantor hereby guarantees to Beneficiary, that [SUBSIDIARY] shall promptly, faithfully and fully complete all of its obligations arising under the JV Agreement in accordance with its terms and conditions.

2.    The Guarantee shall be a continuing guarantee and is to be irrevocable and to remain in full force and effect as long as [SUBSIDIARY] or its successors or assigns shall be obligated to Beneficiary under the terms of or as a consequence of the JV Agreement.

3.    This Guarantee shall be effective notwithstanding any bankruptcy, insolvency or other legal disability (whether voluntary or involuntary) of [SUBSIDIARY] or any of its successors or assigns and the judgement or any court or arbitration panel having jurisdiction over [SUBSIDIARY] or any of its successors or assigns; any limitation or modification of the liability of [SUBSIDIARY] pursuant to the operation of any present or future federal or state statute or rule with respect to bankruptcy, insolvency or similar statutes; the dissolution of [SUBSIDIARY]; and the modification of the JV Agreement shall in every respect be binding and conclusive against Guarantor.

4.    If [SUBSIDIARY] fulfills all obligations under the JV Agreement, Guarantor shall have

11

no obligation under this Guarantee, except to participate in conferences as hereinafter provided in Paragraph 5.1.

5.    If there is no failure by Beneficiary, which has neither been remedied nor waived, to perform it obligations under the JV Agreement, Guarantor's obligation under this Guarantee shall arise after:

    5.1    Beneficiary has notified [SUBSIDIARY] and Guarantor at the addresses described in Paragraph 11 that Beneficiary believes [SUBSIDIARY] has failed (which failure has neither been remedied nor waived) to fulfill its obligations under the JV Agreement ("a [SUBSIDIARY] Default") and Beneficiary has requested and attempted to arrange a conference with [SUBSIDIARY] and Guarantor to be held not later than twenty (20) days after such notice to discuss methods of [SUBSIDIARY]'s fulfillment of all obligations arising under the JV Agreement.    If Beneficiary, [SUBSIDIARY] and Guarantor agree, [SUBSIDIARY] shall be allowed a reasonable time to fulfill its obligations under the JV Agreement, but such an agreement shall not waive Beneficiary's right, if any, subsequently to declare a [SUBSIDIARY] Default; and

    5.2    Beneficiary has declared a [SUBSIDIARY] Default.  Such a [SUBSIDIARY] Default shall not be declared earlier than twenty (20) days after [SUBSIDIARY] and Guarantor have received notice as provided in Paragraph 5.1.

6.    When Beneficiary has satisfied the conditions of Paragraph 5, Guarantor shall promptly and at Guarantor's expense take one of the following actions:

    6.1    Arrange for [SUBSIDIARY] to fulfill all obligations under the JV Agreement; or

    6.2    Undertake to fulfill all of [SUBSIDIARY]'s obligations under the JV Agreement itself; or

    6.3    Waive its right to arrange for [SUBSIDIARY] to fulfill or to undertake to fulfill all obligations itself, and with reasonable promptness under the circumstances:

        6.3.1    After investigation, determine the amount for which it may be liable to Beneficiary and, as soon as practicable after the amount is determined, tender payment therefor to Beneficiary; or

        6.4.2    Deny liability in whole or in part and notify Beneficiary citing reasons therefor.

I-4 Ultimate
Legal Rev. 1-22-13

7.    If Guarantor does not proceed as provided in clause 6 with reasonable promptness, Guarantor shall be deemed to be in default of this Guarantee twenty (20) days after receipt of an additional notice from Beneficiary demanding that Guarantor perform its obligations under this Guarantee and Beneficiary shall be entitled to enforce any remedy available to Beneficiary.  If Guarantor has denied liability, in whole or in part, without further notice Beneficiary shall be entitled to enforce any remedy available to Beneficiary.  Notwithstanding anything to the contrary stated elsewhere herein or in the JV Agreement and in the event Guarantor defaults in its obligations hereunder, Beneficiary shall be entitled to recover all costs and expenses (including attorneys' fees) incurred in enforcing its rights hereunder.

8.    After [SUBSIDIARY] has been found to be in default of its obligations under the JV Agreement, then Guarantor shall be responsible for all costs, losses, damages and expenses incurred by Beneficiary resulting from [SUBSIDIARY]'s failure to fulfill its obligations under the JV Agreement.  Notwithstanding the foregoing, in no event shall (i) the responsibilities and obligations of Guarantor to Beneficiary be greater than those of [SUBSIDIARY]'s responsibilities and obligations under the JV Agreement; or (ii) the responsibilities and obligations of Beneficiary to Guarantor be greater than those of Beneficiary under the JV Agreement.

9.    Guarantor's liability under this Guarantee in respect of all claims made in aggregate hereunder shall be limited to and shall not exceed the liability of [SUBSIDIARY] pursuant to the JV Agreement.  Guarantor shall not be liable to Beneficiary or others for obligations of [SUBSIDIARY] that are unrelated to the JV Agreement.  No right of action shall accrue on this Guarantee to any person or entity other than Beneficiary or its heirs, executors, administrators or successors.

10.   Any proceeding, legal or equitable, under this Guarantee may be instituted in any court of competent jurisdiction within the State of Florida in the City of Orlando and shall be instituted within two years after [SUBSIDIARY]'s default or within two years after [SUBSIDIARY] has ceased working or within two years after Guarantor refuses or fails to perform its obligations under this Guarantee, whichever occurs first.  If the provisions of this clause are void or prohibited by law, the applicable limitation period shall be the minimum period of limitation available to guarantors as a defense in the jurisdiction of Florida.

11.   Notices to Guarantor, Beneficiary, and [SUBSIDIARY] shall be mailed or delivered to the following addresses:

To Guarantor:            [INSERT]

To Beneficiary:          [INSERT]

To [SUBSIDIARY]:        [INSERT]

12.   This Guarantee and all rights and obligations hereunder shall be construed and enforced in accordance with the laws of the State of Florida regardless of its or any other jurisdiction's choice of law principles.

I-4 Ultimate
Legal Rev. 1-22-13

**IN WITNESS WHEREOF,** Guarantor has duly executed and delivered this Guarantee as of the date first above written.

**ATTEST:**                                    **[INSERT NAME]**
                                               **("Guarantor")**


_____        BY:   _____

(Name)_____          (Name)_____

(Title)_____         (Title)   _____

I-4 Ultimate
Legal Rev. 1-22-13