## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

THE LANE CONSTRUCTION
CORPORATION,

      Plaintiff,

v.                                    Case No. 6:21-cv-164-RBD-DCI

SKANSKA USA CIVIL
SOUTHEAST, INC.; and GRANITE
CONSTRUCTION COMPANY,

      Defendants,

v.

SALINI IMPREGILO S.P.A.; and
SKANSKA-GRANITE-LANE,

      Third-Party Defendants.
_____

## <u>MEMORANDUM OPINION AND ORDER</u>

      This cause is before the Court following a ten-day bench trial that concluded on October 27, 2023, and ripened for decision on February 15, 2024. Having considered the evidence, argument, and authority and assessed the credibility of witnesses, the Court resolves the merits under Federal Rule of Civil Procedure 52.

## INTRODUCTION

      Since February 2022, Central Florida drivers have benefited from the new I-4 express lanes running through Orlando. While these drivers no doubt noticed

the construction on the highway for the preceding seven years, most probably do not know the turmoil that took place behind the scenes in the process of this project becoming a reality. This case tells that story.

Nearly a decade ago, in 2013, the Florida Department of Transportation announced the State of Florida's largest construction project ever: a six-year, $2 billion reconstruction of more than twenty miles of a notoriously congested section of I-4, spanning from Longwood through downtown Orlando and down past the turnpike toward the attractions. This massive "I-4 Ultimate Project" involved the top-to-bottom overhaul of fifteen exits, dozens of bridges, and multiple general use traffic lanes—plus the construction of four express toll lanes. But the original projections for the Project proved wildly off the mark. It ended up taking a year longer and costing the State $125 million more than anticipated. And rather than profiting off this historic Project, the three contractors who built it ended up $500 million in the hole. All of them sued each other, bringing us here.

The broad strokes of the dispute are these. The Project was structured as a public-private partnership, financed partially by the State and partially by a private concessionaire that would profit by maintaining the road over time. After a bidding process, in 2014, the State engaged I4MP—an entity made up of Skanska ID and John Laing—as the concessionaire. I4MP then engaged a design-builder, the joint venture SGL—made up of majority partner Skanska SE and

2

minority partners Granite and Lane—to do the construction. The construction world is a small one, and the three SGL partners had worked together before.

The partners' relationship was cordial when construction began in 2015. But by the beginning of 2018, the Project was dramatically over budget and behind schedule. During the same period, Lane was bought out by foreign company WeBuild, which threw a wrench into the partners' dynamic. As the Project's losses grew and the partners faced multimillion-dollar monthly capital calls to keep it going, they grasped for strategies to stem the tide. SGL ultimately focused on two divergent options: option #1 involved negotiating a global resolution with the State for more funding and an extension of the Project's completion date, while option #2 involved demanding that the concessionaire give notice to the State to terminate the Project.

SGL's lawyers told them that the termination option would lead to ruined reputations and protracted litigation—while costs and work would continue unabated as the dispute ran its course. So at the end of 2018, all three partners decided to pursue option #1 (settlement). But when negotiations with the State began to bear fruit, Lane—with its purse strings pulled tight by guarantor WeBuild—reversed course and decided it wanted to pursue option #2 (termination). Skanska SE and Granite disagreed, choosing—over Lane's objection—to accept settlement with the State at the beginning of 2020. This

3

settlement resulted in a $125 million payment from FDOT and a near year-long extension of the completion date. Despite these concessions, the losses kept mounting.

So at the beginning of 2021, with over a year left on the Project, Lane stopped paying its share of the capital calls and sued Skanska SE instead. Lane claimed that Skanska SE, as SGL's managing partner, breached its fiduciary duties by acting against the best interests of the partnership in accepting the settlement over Lane's objection. Lane's theory was that Skanska SE was working in favor of Skanska ID, part of concessionaire I4MP, in rejecting the termination option to SGL's detriment. Skanska SE countersued Lane for breaching SGL's partnership agreement by failing to pay the capital calls needed to keep the Project afloat. All three partners, the partnership, and Lane's guarantor ended up in the suit.

Skanska SE and Granite kept funding the Project, which was completed in 2022. The Court found before trial that Lane breached the partnership contract by failing to pay capital calls. The Court conducted a bench trial in late 2023 on the issues of whether Skanska SE breached its fiduciary duties and how much Lane owed its partners for breaching the contract. The evidence did not prove Lane's fiduciary breach theory at trial. Rather, the overwhelming evidence established that Skanska SE acted in the best interest of SGL and its partners in rejecting the termination option, which likely would have been ruinous for all involved, and

4

pursuing settlement, which ended up with a very favorable deal for the partners. The evidence also established that Lane owes its partners about $80 million that it should have paid in the first place.

So we end up here, with the parties' relationships broken but the Project completed. With that foundation, the Court makes these findings of fact and conclusions of law.

## FINDINGS OF FACT[1]

### I.      The Players

1.      Skanska-Granite-Lane ("SGL") is the joint venture ("JV") at the center of this litigation, formed between Skanska USA Civil Southeast, Inc. ("Skanska SE"), Granite Construction Company ("Granite"), and Lane Construction Corporation ("Lane"). Salini Impregilo S.p.A. n/k/a WeBuild S.p.A. Inc. ("WeBuild") is Lane's parent company. Skanska SE, Granite, Lane, SGL, and WeBuild are the parties. (JPS,[2] ¶¶ 1, 8–9.)

2.      Skanska SE's President was Rich Cavallaro until October 2018; he was replaced by Don Fusco. Its in-house counsel was Michael DiPaolo, and its outside counsel was Bruce Meller of Peckar & Abramson. (Doc. 527, p. 149:4–6; Doc. 531,

---

[1] These facts have been established by a preponderance of credible evidence. *See also infra* note 8. To the extent that any of these factual findings represent conclusions of law, the Court adopts them as such, and vice versa.

[2] JPS refers to the parties' agreed facts in their Joint Pretrial Statement. (Doc. 427, pp. 33–40.)

pp. 36:20–37:23, 54:17–18, 59:6–15.)

3.    Granite's President and CEO was Jim Roberts. (Doc. 526, p. 78:13–14.)

4.    Lane's CEO was Robert Alger until June 2019; he remained on as Chairman of the Board until June 2020. (*Id.* at 5:20–6:2, 8:1–20; Doc. 528, pp. 130:21–131:5, 154:18–155:6.)

5.    SGL's outside counsel were Ben Subin of Holland & Knight ("H&K") and Brad Copenhaver of Vezina, Lawrence & Piscitelli ("VLP"). (Doc. 530, p. 62:9–17; Doc. 531, p. 159:16–18.)

6.    WeBuild's Deputy General Manager was Ignacio Botella. Its CFO was Gianfranco Catrini. (Doc. 526, pp. 77:20–24, 101:16–23.)

7.    The Florida Department of Transportation ("FDOT") is the state entity that owns and contracted the public-private partnership ("P3") construction project called the I-4 Ultimate Project ("Project"). (JPS, ¶¶ 1, 10.)

8.    On the private side, P3s typically involve a concessionaire funding the project and a design-builder constructing the project. In this Project, SGL was the design-builder. The concessionaire was I-4 Mobility Partners OpCo LLC ("I4MP"). Half of I4MP was owned by Skanska Infrastructure Development ("Skanska ID"), a now-defunct subsidiary of the larger Skanska operation. The other half was owned by John Laing Investments Limited ("John Laing"). (JPS, ¶¶ 1, 12; JE[3] 1, 39,

---

[3] JE refers to the joint exhibits (Doc. 520); LA to Lane's exhibits (Doc. 521); and SK to

282; Doc. 314-3, p. 5; Doc. 314-7, pp. 21:25–22:7; Doc. 526, pp. 219:19–220:18; Doc. 529, p. 78:4–10.)

9.     Skanska ID was not a corporate parent to Skanska SE. Rather, Skanska SE's corporate parent is Skanska USA Civil, Inc. Both Skanska SE's and Skanska ID's ultimate parent is Skanska AB. Its Executive Vice President is Richard Kennedy. (Doc. 527, pp. 149:2–6, 150:23–151:5; Doc. 531, p. 29:20; Doc. 532, p. 129:12–17.)

## II.   The Project

10.     The Project began in 2013, when FDOT requested applications for a P3 partner to reconstruct, operate, and maintain a twenty-one-mile stretch of Interstate 4 ("I-4") spanning the area west of Kirkman Road in Orange County through downtown Orlando to east of State Road 434 in Seminole County. (JPS, ¶ 10; JE 279.)

11.     The Project was the state's most costly road project ever, with an estimated cost of over $2.3 billion. It was expected to be completed in six years. (JPS, ¶¶ 10, 13; JE 41.)

12.     Skanska SE, Granite, Lane, Skanska ID, and John Laing submitted a joint bid for the Project, with Skanska SE, Granite, and Lane preparing the design-

---

Skanska's (Doc. 522). For ease of review, the specific trial exhibits cited herein are also attached to the appendix filed with this Order.

bid proposal, and Skanska ID and John Laing preparing the pricing proposal as the concessionaire. (JE 282.)

13.     Related entities participating in the concessionaire arm and the design-build arm are common in P3s. Lane was aware from the beginning that the proposed Project team included Skanska ID at the concessionaire level and Skanska SE at the design-build level. (JE 280; JE 283, p. 4; Doc. 473-1, pp. 29:3–15, 31:19–32:2; Doc. 526, pp. 11:19–12:19, 219:19–220:18; Doc. 529, p. 78:4–10.)

14.     Lane had worked with both Skanska and Granite on large projects and had served as both majority and minority partners in their previous joint ventures. (Doc. 526, pp. 11:19–12:19.)

15.     Lane was involved throughout the bidding process, including discussions about the profit margins and contingencies and review of draft contracts. (JE 39, 284, 285, 286; Doc. 531, p. 187:11–20.)

16.     In September 2014, FDOT awarded the Project to Skanska ID and John Laing as I4MP, giving it the right to develop, finance, design, construct, operate, and maintain the Project for forty years. Skanska SE, Granite, and Lane as SGL was engaged as the design-builder. (JPS, ¶ 1; JE 1, 42, 282.)

17.     Construction began in February 2015. The Project was to be substantially completed at the end of 2020. (JPS, ¶¶ 14–15; JE 41, 42; Doc. 314-6, p. 5; Doc. 532, pp. 54:5–11, 99:3–99:9.)

8

### III.    The Agreements

18.    Skanska SE, Granite, and Lane's relationship as SGL is governed by the Joint Venture Agreement ("JVA"). The JVA provides that the JV's profits and losses are to be split among the partners, with 40% going to Skanska SE and 30% each going to Granite and Lane. Skanska SE served as the managing partner. SGL was run by an Executive Committee with a representative from each partner. The JVA required decisions of the Executive Committee to be unanimous, but allowed Skanska SE to act absent unanimity when "approval [wa]s critical" to "avoid partial or total suspension" of work on the Project. If a matter was resolved without unanimous vote, the JVA provided dispute procedures, but each partner remained responsible for its obligations while the dispute was pending. (JE 1, §§ 3.1, 4.1, 4.3, 5.1, 7.2.)

19.    I4MP and FDOT's relationship is governed by the Concession Agreement ("CA"). The CA permitted FDOT and I4MP to terminate for "relief events" causing delays of more than 180 days. I4MP and SGL's relationship is governed by the Design-Build Agreement ("DBA"), which incorporates parts of the CA. The DBA permitted SGL to seek more compensation or extension of the Project completion date via relief event claims. But unlike the CA, the DBA stated that SGL had no right to terminate based on extended relief events. The DBA capped SGL's liquidated damages in the event of a breach, but if SGL abandoned

the Project, no cap applied. (JE 41, §§ 10.1, 19.2.12, 20.2; JE 42, §§ 10.2.2.4, 20.2, 20.5.3.1.)

20.     Each of the JV partners' parent companies signed a Guaranty Agreement guaranteeing their obligations under the DBA. Lane's parent and guarantor at the time the Guaranty Agreement was originally signed was Lane Industries, Inc. WeBuild, an Italian company, acquired Lane's parent in 2015, shortly after the Project began. The Guaranty Agreement was amended so that WeBuild took over the guarantee obligations. (JPS, ¶¶ 8–9; JE 66.)

### IV.  Construction & Delays

21.     After construction began in 2015, things began to change at Lane when its parent company was acquired by WeBuild toward year-end. Lane CEO Alger knew, with a foreign company taking over, there would likely be a change in leadership, and "the writing was on the wall" beginning in 2016. WeBuild began to send more people from Italy to take over on the Project. Both insiders at Lane and outsiders at Skanska SE perceived the new people as more aggressive and uncooperative—essentially, "hothead[s]." The relationship between the JV partners began to deteriorate. (Doc. 526, pp. 6:2–7:24, 26:6–20, 120:7–13, 199:20–200:13; Doc. 527, p. 171:18–25; Doc. 529, p. 148:8–21; Doc. 531, pp. 197:6–24, 227:2–13.)

22.     While the relationship was souring, the Project also began going

poorly. A downturn in the economy around that time meant that materials were more expensive and SGL could not draw the quality labor it needed. SGL's estimated costs—collectively prepared by all of the partners—did not account these for difficulties and proved to be too low. Toward the end of 2017, it became clear that the Project was not going to be completed on time and within budget. (Doc. 531, pp. 216:4–21, 219:12–220:14.)

23.    Lane was well aware of the financial status of the Project. Native Italian Michele Gorasso, a WeBuild employee who became a Lane employee, served as SGL's administrative finance control manager. He had access to the JV's books used to prepare the recommended working capital calls to the JV partners for money needed to keep the Project going. All three JV partners had access to the Project's cost system and regularly reviewed financial forecasts. (*Id.* at 209:5–211:24; Doc. 534, pp. 168:5–8, 178:11–12, 178:25–179:15.)

24.    In late 2017, given this financial downturn, SGL's outside counsel H&K produced its first memorandum analyzing potential termination of the Project. This short memo pointed to the provisions in the CA that permitted FDOT and I4MP to terminate for relief events causing delays of more than 180 days. But the memo concluded that even if I4MP could terminate the CA in such an event, FDOT could continue the DBA and have SGL continue the Project. (JE 36; JE 41, § 20.6.3; JE 42, §§ 10.2.2.4, 20.2, 20.5.3.1.)

25.     Starting in April 2018, the partners began facing multimillion-dollar capital calls every few months to keep the Project afloat. (JE 548.)

26.     With the Project facing mounting losses, in spring 2018, WeBuild's owner was intent on "get[ting] the money back," "no matter the consequences." WeBuild began looking for reasons to sue Skanska SE. WeBuild CFO Catrini asked Lane CEO Alger "what ass are we kicking." (JE 294, 319; LA 163, 165; SK 170.)

27.     Meanwhile, the other JV partners were not blind to the financial difficulties of the Project. In May 2018, the JV decided to submit the "drilled shaft claim" to I4MP, seeking recovery of $48 million and adding 245 days of delay to the completion date. The drilled shaft claim arose from a delay that occurred when two drilled shafts in the same location encountered fissures, making it impossible to construct them as specified by FDOT in the original technical requirements. A month later, SGL submitted the claim to I4MP. I4MP added $50 million in damages of its own to the claim and then submitted it to FDOT under the CA. (JPS, ¶¶ 17–19; JE 21, 27, 42, 310, 312, 361; Doc. 314-11; Doc. 314-4, pp. 87–101; Doc. 473-1, pp. 64:2–17, 145:8–16; Doc. 526, pp. 53:22–54:1, 63:14–64:2, 157:13–158:13; Doc. 528, pp. 148:10–12, 149:25–150:18, 172:22–173:2; Doc. 529, pp. 26:20–27:3; Doc. 530, pp. 82:5–85:11, 90:23–92:1; Doc. 531, p. 220:1–6.)

28.     Despite this submission, there was no contractual guarantee that FDOT would accept the drilled shaft claim. The CA provided that I4MP bore the

risk of incorrect information about site conditions, and the DBA passed that risk down to SGL. Once the claim was submitted, neither the basis for entitlement nor the relief sought could be changed. The drilled shaft claim did not request termination of the Project. (JE 41, §§ 3.1.1.4, 3.2.2, 10.1.5.6; JE 42, § 3.2.2; Doc. 473-1, p. 145:8–16; Doc. 528, pp. 149:25–150:18.)

## V.    Termination Option

29.    At the same time the JV was considering the drilled shaft claim, it was also continuing to consider whether terminating the Project was feasible, in what the parties referred to as the "termination option." In May 2018, SGL's outside counsel H&K produced a second memo on the termination option. This memo asserted a new theory, pointing to a provision in the DBA that required I4MP to use reasonable efforts to enforce its rights under the CA "for the benefit of" SGL. It concluded that SGL could, under this provision, request that I4MP terminate the CA. Nevertheless, the memo noted—consistent with H&K's earlier analysis—that continuation of the DBA and SGL's obligations on the Project rested with FDOT even if the CA were terminated. This memo was explicitly "predicated on the assumption that SGL can timely and irrefutably plead and prove entitlement in excess of 180 Relief Event days." (JE 25, pp. 2–3; JE 41, App'x 23, § 1.1; JE 42, §§ 20.2.2, 20.2.3.)

30.    As with the drilled shaft claim, I4MP had the option not to pass any

request for termination up to FDOT. If I4MP independently assessed the claim and decided not to proceed with it, the claim would have to go through a dispute resolution process under the DBA, while SGL still had to perform. Under this process, SGL could be found liable for asserting a frivolous claim, so there were potential financial consequences to making the request. And even if I4MP did elect to proceed with termination, FDOT also had the option to continue the CA for 180 days, meaning SGL would have to keep working during that time in any event. (JE 41, App'x 23, §§ 2.6.3.3, 2.13; JE 42, § 20.2.3; Doc. 526, pp. 228:14–231:15.)

31.    In June 2018, while the partners were considering their options, another outside law firm, VLP, was also asked to produce a memo on the termination option for SGL. Like H&K's memo, VLP's memo was explicitly predicated on the assumption that the Project delay exceeded 180 days. In even stronger terms than H&K's memo, VLP's memo warned SGL against relying on the 245 days of delay asserted in the drilled shaft claim, advising instead to wait until 180 days past the substantial completion date in 2020, or at least until FDOT recognized there were more than 180 days of delay. Essentially, VLP believed that establishing the requisite days of delay under the CA would be a moving target as the Project continued. VLP concluded that "the serious consequences of a notice of intent to terminate to all Project stakeholders should render termination a remedy of last resort." (JE 21.)

32.     H&K wrote a third memo on the termination option in August 2018. This memo acknowledged that SGL demanding termination could put I4MP in an "unfavorable position." But it was steadfast in its continued warnings that I4MP and FDOT could reject the claim and continue the Project anyway, noting that "the only party incurring damages in this scenario is potentially SGL." And H&K again, like VLP, cautioned that SGL had to definitively establish the 180 days of delay. (JE 26.)

33.     Lane understood that submission of the drilled shaft claim was not enough in itself to establish 180 days of delay and that the JV would have to prove it. The JV knew that FDOT could and likely would challenge the basis for the delay asserted in the drilled shaft claim. (Doc. 526, pp. 134:13–135:3, 157:2–5; Doc. 528, pp. 146:20–150:18.)

34.     Despite the concerns outlined in SGL's outside counsel's memos, Lane, pushed by WeBuild, wanted to pursue analysis of the termination option to curtail the partners' mounting losses. The issue came to a head in October 2018, when Lane called for a meeting of the JV to discuss the termination option. (JPS, ¶ 21; JE 36, 358, 359; Doc. 526, pp. 146:4–151:17; Doc. 531, pp. 135:20–136:2.)

35.     The night before the meeting, Skanska SE's in-house counsel DiPaolo sent SGL's outside counsel Subin at H&K an email observing that "[p]roceeding on a claim (rather than a determination) of greater than 180 days would be

15

foolhardy in my opinion given the stakes. I presume you agree." (LA 17.)

36.     This email figured heavily in Lane's argument that Skanska SE pressured H&K to change course, suddenly deciding to recommend rejecting the termination option and thus harming SGL. The Court rejects this characterization.

37.     DiPaolo's comment that he "presume[d]" H&K agreed that relying on a *claim* of 180 days of delay rather than a *determination* was risky makes eminent sense. H&K had consistently warned SGL that it would have to *prove* the 180 days under any termination scenario. VLP had said the same. Of course DiPaolo presumed that—H&K had said it all along. (*See* JE 25, 26, 41; Doc. 527, pp. 210:16–214:12.)

38.     The Court finds there was nothing nefarious about this email. Skanska SE, as the JV's managing partner, was preparing for a meeting and asking the JV's outside counsel questions about their previous advice. The rest of the email shows DiPaolo trying to understand all options available to SGL, including termination, and the potential consequences. It does not show he was trying to influence H&K to do anything. Both DiPaolo and Subin testified credibly on this point. (LA 17; Doc. 527, pp. 210:16–214:12; Doc. 530, pp. 115:20–124:1.)

39.     The meeting took place the day after the email. Lane's presentation of the termination option did not go well. Lane had told the other partners that its outside counsel would have a white paper on the termination option, but they did

not provide one at the meeting. Lane's counsel also left the meeting early with the other partners' questions unanswered. Skanska SE's in-house counsel DiPaolo, along with its outside counsel Meller, did not find Lane's presentation persuasive. Rather than deciding to pursue termination at that meeting, the partners collectively decided that the JV would pursue a negotiated settlement with FDOT while H&K explored the contractual basis for the termination option further. (JE 358, 359;  SK 180;  Doc. 526,  pp. 146:4–153:12;  Doc. 527,  pp. 215:9–217:8; Doc. 531, pp. 135:20–136:2, 136:21–138:7, 141:6–18, 142:13–143:19.)

40.    Skanska AB's Kennedy attended this meeting. Lane CEO Alger and WeBuild GM Botella[4] testified that they believed Kennedy was against termination because it would cause Skanska ID to lose money (as part of the concessionaire I4MP) if the Project was terminated. But their beliefs were based only on speculation about Kennedy's motives and his body language and facial expressions. The Court finds this speculation baseless and Alger's and Botella's testimony not credible on this point. None of the documentary or other testimonial evidence suggested any improper motive by Kennedy. The Court finds Kennedy's

---

[4] There was much discussion at trial as to whether Botella made a remark at the meeting that SGL should "put a knife to I4MP's throat" as a negotiating tactic. Given the number of people who testified that he did not say that—and the likelihood that they would remember such an inflammatory remark—the Court is skeptical. But whether he said it is irrelevant as Lane agreed with the other partners to pursue negotiating settlement rather than threaten termination at that point. (JE 157, 385; SK 180; Doc. 526, pp. 168:13–170:1; Doc. 527, pp. 29:20–30:7, 217:9–218:1; Doc. 528, p. 83:14–19; Doc. 530, pp. 125:5–13, 129:16–130:2; Doc. 532, p. 56:7–15.)

testimony credible that he doubted the viability of the termination option based on the advice of counsel and his experience in the construction industry. (JE 378, p. 10; Doc. 525, p. 12:9–20; Doc. 526, pp. 76:16–25, 80:19–81:13, 85:12–87:1, 115:21–116:7, 194:3–14, 233:24–234:20; Doc. 527, pp. 23:17–24:17; Doc. 531, pp. 45:19–48:7, 62:17–63:25, 107:22–109:21, 117:22–118:15.)

41.    In any event, what Kennedy thought about the termination option was not dispositive because he was not the decisionmaker. Rather, Skanska SE's previous CEO Cavallaro was skeptical of the termination option before he was replaced, and Fusco was also skeptical of it once he took over. The evidence does not support Lane's speculation that Cavallaro was replaced so Kennedy could take over the decision and act in Skanska ID's or Skanska AB's interest to continue the Project to SGL's detriment.[5] Fusco credibly testified that he was not pressured by Kennedy in making the decision to reject the termination option.[6] Rather, the evidence established that Skanska SE had been skeptical of termination from the start, as counsel's advice all along had pointed out the risks. (Doc. 473-1,

[5] In support of the assertion that Kennedy was acting on behalf of I4MP/Skanska ID, Lane pointed to an email from Skanska AB CFO Magnus Persson to Kennedy in March 2019 stating, "I believe we need to work around this issue with also I4MPs [sic] undertaking in mind." (LA 23, p. 1.) But the timing of this email undercuts the argument that it influenced Skanska SE's rejection of the termination option in late 2018, as discussed further below. Kennedy also testified that he did not report to Persson and that it was Persson's job to look out for I4MP, not Kennedy's. (Doc. 531, pp. 105:9–106:21, 119:15–120:14, 125:2–18.)

[6] The meeting took place on Fusco's first day on the job as Cavallaro's replacement, so Fusco's absence was not unusual, nor does it establish that Kennedy and not Fusco was the decisionmaker. (Doc. 529, pp. 165:20–166:2; Doc. 531, pp. 59:10–22, 71:20–72:7.)

pp. 122:12–123:20; Doc. 527, pp. 172:9–174:3, 175:5–23, 202:5–8; Doc. 528, pp. 18:16–19:6, 46:21–48:24; Doc. 529, pp. 64:12–65:4, 70:19–72:9, 99:5–16, 159:5–161:14, 171:20–25; Doc. 531, pp. 43:14–44:6, 55:3–6, 67:23–68:13, 70:20–71:7, 89:11–18, 115:19–116:20, 192:25–194:4, 225:8–17, 228:8–13; Doc. 532, pp. 222:15–225:4.)

42.     After the meeting, representatives from all three partners met with FDOT several times to discuss potential settlement. Sometimes Brian Stieritz, as the managing partner's representative, met with FDOT alone, but sometimes all partners were included, and Stieritz always followed up with SGL's Executive Committee. Lane was part of these discussions. The evidence established that Lane was not left out of the loop. (JE 410, 553; SK 53; Doc. 526, pp. 164:8–185:17; Doc. 529, pp. 127:11–146:16; Doc. 532, pp. 58:16–71:14.)

43.     While settlement negotiations were beginning, on October 25, 2018, Lane's outside counsel provided its own memo about the termination option. This memo concluded that termination of the CA and DBA was the "best opportunity for SGL to avoid the losses it is projected to incur through completion" of the Project. This analysis relied on the 245-day claimed delay asserted in the drilled shaft claim; it did no investigation as to whether SGL could actually prove that claimed delay. The memo acknowledged that the "most probable negative scenario" was that SGL would have to complete the Project while termination was litigated. (LA 18.)

19

44.     Soon after, in November 2018, H&K followed up with another memo on the termination option. This was the first memo to analyze whether the 180 days of delay had provably occurred. The memo concluded that SGL did not have a clear entitlement to the requisite days of delay. So H&K recommended that it would be "reckless" for SGL to demand termination. (JE 6.)

45.     The H&K memo identified issues with "concurrencies," that is, other delays in the Project not caused by a compensable relief event.[7] Concurrencies could not contribute to the 180 days of delay required for termination of the CA. Starting in fall 2018 before H&K drafted this memo, SGL's Project scheduler had found concurrencies in the schedule that caused concern about whether the 245 days of delay asserted in the drilled shaft claim would hold—especially because SGL was contractually required to mitigate delays as the Project went on. The concurrency issue contributed to H&K's conclusion that SGL did not have a clear entitlement to the requisite 180 days of delay needed to pursue the termination option. (JE 6; JE 41, § 10.1.5.15; SK 185, 186, 188; Doc. 528, pp. 11:2–6, 12:6–12, 13:24–14:1, 109:14–113:7, 166:18–167:13, 170:23–171:10, 174:3–176:3; Doc. 530, pp. 93:11–94:4, 97:3–23, 101:22–106:4, 109:16–115:1.)

46.     Even assuming SGL could establish the delay, H&K's memo also

───────────────

[7] Lane CEO Alger recalls learning of the concurrency issue but dismissing it. (Doc. 526, pp. 135:4–138:10.)

20

expressed concern about a "scrivener's error" in the DBA. Lane's counsel's memo had pointed to a particular provision in the DBA to argue that if the CA was terminated, I4MP would have to assume SGL's obligations under the DBA, letting SGL off the hook and ending the partners' losses. H&K had a discussion with the drafter of the DBA and CA and determined that this provision in the DBA was a scrivener's error. According to the drafter, the provision was instead intended for *FDOT* to take *I4MP*'s place in enforcing the DBA if the CA were terminated, rather than having *I4MP* take *SGL*'s obligations. H&K concluded that even if Lane's interpretation of the provision were correct and I4MP did have to take SGL's obligations, it would likely result in protracted litigation over the meaning of the provision, during which SGL would still have to keep working. The Court finds the scrivener's error issue relatively insignificant. Even if there were a scrivener's error, SGL pursuing the termination option was based on clearly establishing 180 days of delay, which the evidence shows was far from guaranteed. And Lane conceded at trial that it would never walk off the Project; Lane's counsel's October memo said as much. So the only significance of the "scrivener's error" is that it introduced one more element of risk to the partners' consideration of the already otherwise risky termination option. (JE 6, 41; JE 361, pp. 7–8; LA 18; SK 180; Doc. 527, pp. 219:13–223:22; Doc. 528, pp. 4:7–7:13; Doc. 530, pp. 127:21–129:8, 211:16–212:5, 215:5–217:9, 218:2–21; Doc. 531, pp. 3:21–4:9, 5:2–19, 68:1–69:6.)

21

47.     The November H&K memo was another key point in Lane's argument that Skanska SE pressured H&K to change course on the termination option and thus acted to SGL's detriment. Again, the Court rejects this characterization.

48.     Every previous memo was explicitly predicated on the understanding that SGL would have to prove its entitlement to 180 days of delay to pursue termination. The November memo did not change course. It was simply the first one to conclude that SGL could not actually do so, which was based on updates to the schedule after the drilled shaft claim was submitted. (JE 6, 25, 26, 41; Doc. 530, pp. 81:16–92:1.)

49.     H&K attorney Ben Subin, a well-known and respected construction lawyer with decades of experience, testified credibly that he was not pressured to change his opinion, nor did H&K change its opinion. There was no testimonial or documentary evidence supporting Lane's claim that Subin or anyone at H&K changed course, were improperly influenced, or acted inappropriately. In fact, Lane's counsel conceded in closing argument that Subin was credible and acted competently. (Doc. 473-1, pp. 73:18–74:7, 75:2–76:4, 108:13–109:9; Doc. 524, p. 14:11–20; Doc. 527, p. 191:15–24; Doc. 528, p. 12:13–22; Doc. 530, pp. 69:2–7, 81:2–95:1, 98:4–101:1, 101:22–106:4, 109:16–115:1.)

50.     Ultimately, Skanska SE decided that pursuing the termination option

was not in the JV's best interest. Skanska SE executives and attorneys were all persuaded that pursuing the termination option was reckless because SGL could not prove a clear entitlement to the requisite 180 days of delay. Skanska USA Civil's in-house counsel Steven Lunsford, who served as counsel for the Project's claims committee, testified credibly about how seriously the company took the possibility of the termination option, with multiple attorneys looking into its viability. He persuasively explained that with the company losing so much money on the Project and people losing their jobs over it, if termination was a valid option, they would have taken it; but it was not. The Court finds that Skanska SE reasonably relied on competent advice from counsel in declining to pursue the termination option. (Doc. 527, pp. 189:23–192:4; Doc. 528, pp. 10:2–12:12, 122:21–23, 128:5–129:1, 130:16–20, 139:9–20, 204:3–207:25; Doc. 529, pp. 94:1–97:17.)

51.    Skanska SE's decision was well-founded. Skanska SE's outside counsel Meller, who was experienced with FDOT claims, shared H&K's concerns and strongly cautioned against threatening termination because FDOT would essentially start "World War III." VLP's Copenhaver, who also had extensive dealings with FDOT, shared Meller's opinion, testifying credibly that FDOT would have gone "to war" had SGL threatened termination. With multiple attorneys likening pursuing termination to going to war with FDOT, it was reasonable for Skanska SE to avoid that option. (SK 13; Doc. 531, pp. 147:25–153:12,

176:11–181:11.)

52.     Lane (and WeBuild) knew that getting Granite's support in "pick[ing] a fight" with Skanska SE about the termination option was vital. But despite Granite being positionally aligned with Lane as a fellow minority partner, Lane failed to sway Granite. Rather, Granite shared the same concerns as Skanska SE— SGL would have too much difficulty in proving 180 days of delay to pursue termination. Granite justifiably worried that if SGL sought to terminate, it would have to perform anyway and suffer serious harm to its reputation and exposure to costly liquidated damages. If Skanska SE were truly acting to the JV's detriment out of some nefarious intent, Granite should have agreed with Lane; but Granite did not. This fact weighs heavily on the Court's finding that rejecting termination was in SGL's best interest. (JE 294, 319; LA 163, 165; SK 170; Doc. 477, pp. 9–10, 29– 30, 33, 38–39; Doc. 529, pp. 101:14–16.)

53.     Copious evidence established that Skanska SE and Granite's concerns about the impact to the partners' reputation of pursuing or threatening termination were well-founded. Lunsford testified credibly that "[y]ou would have to bet the company, essentially, that you're right about those 180 days." Threatening termination would mean the JV would lose any opportunity for reasonable negotiation with FDOT about the drilled shaft claim or anything else. There would be no wiggle room on the completion date, putting the JV at almost

certain risk of defaulting and then incurring potentially unlimited liquidated damages and high reprocurement costs. And the partners would have to keep working during the disputes even after they tried to terminate, while being flyspecked by FDOT and having to "dot every I and cross every T." There would be litigation for years with both I4MP and FDOT. And not just this Project would be at risk; other current and future construction projects would be threatened, the companies would have to disclose whether they had been defaulted on all upcoming projects as a permanent black mark on their records, and they would be "persona non grata" with FDOT, a massive customer. So the risks were just too high. (Doc. 528, pp. 166:4–167:13, 171:22–172:17, 174:20–176:3, 177:22–178:15, 187:9–188:15; Doc. 529, pp. 99:17–101:16; Doc. 530, pp. 147:3–148:8; Doc. 531, pp. 152:7–153:12, 176:11–181:11, 223:1–225:7.)

54. Along with the difficulty with proving 180 days of delay, I4MP likely would not have terminated the CA with FDOT even if SGL demanded it. John Laing—the only entity that would have voted, given that Skanska ID was contractually required to recuse itself if SGL demanded termination—maintained that SGL had no right to terminate. (JE 287, § 7.2; LA 224, p. 3; LA 225, p. 2.)

55. So at the end of 2018, the factors weighed by the JV about the termination option were as follows. Two of SGL's outside firms had strongly warned against pursuing the termination option based on several elements of risk.

There were doubts as to whether I4MP would terminate even if SGL requested it. There were significant questions about whether SGL could prove the requisite delay. Everyone who knew FDOT cautioned that FDOT would take a termination notice or threat very poorly. There were colorable questions about what would happen to SGL's obligations under the DBA even if FDOT agreed to terminate the CA. Walking off the Project would have subjected SGL to potentially unlimited damages, and no one reasonable actually planned to walk off the Project. And executives at all of the JV partners were deeply concerned that pursuing termination would ruin the companies' reputations and result in war with FDOT. Based on these factors, the Court finds it was in the JV's best interest to decline to pursue termination and instead pursue settlement negotiations. (Doc. 526, p. 142:3–11; Doc. 528, pp. 44:7–17, 53:1–11, 166:4–167:13, 171:22–172:17, 174:20–176:3, 177:22–178:15, 187:9–188:15; Doc. 529, pp. 99:17–101:5; Doc. 530, pp. 147:3–148:8; Doc. 531, pp. 152:7–153:12, 176:11–181:11, 223:1–224:9.)

56.    Lane's expert Kevin Dennis testified at trial that there were no downsides to the JV pursuing the termination option at the end of 2018. The Court does not find him credible. His opinions turned on the assumptions that I4MP would have accepted termination and passed it forward (or paid SGL itself), FDOT would have accepted it, and SGL would have stopped incurring losses immediately. But the evidence does not bear out any of those assumptions. On

questioning by the Court, undercutting the core of his own opinions, Dennis admitted that he had no experience with P3s, termination was an action of last resort, he did not consider VLP's memo or truly consider the downsides to termination pointed out in H&K's memos, and he did not analyze the potential damages for wrongful termination or unlimited liability if SGL defaulted. Nor did the timing of Dennis's calculations (based on termination at the end of 2018) make any sense because at that point, Lane had not yet demanded termination. Rather, all three partners agreed to take part in settlement discussions with FDOT, which were bearing fruit. (Doc. 527, pp. 77:16–79:11, 113:5–119:16; Doc. 532, pp. 219:5–220:20.)

## VI.    SA22

57.    SGL's productive settlement discussions with FDOT continued into 2019. These global discussions encompassed resolution of the drilled shaft claim and all other relief claims previously submitted. These discussions eventually resulted in a global agreement known as Supplemental Agreement 22 ("SA22"). (JPS, ¶ 22; JE 79; Doc. 306-9; Doc. 314-32, p. 3; Doc. 532, pp. 75:22–78:6.)

58.    Representatives from all three partners were intimately involved in negotiating SA22, including Lane CEO Alger, Granite CEO Richards, and Skanska SE CEO Fusco. Alger and Fusco had a good relationship. (LA 11; Doc. 473-1, p. 165:3–8; Doc. 526, pp. 164:8–185:17; Doc. 529, pp. 123:7–146:16;

Doc. 532, pp. 62:24–63:5, 63:22–64:17, 90:1–9.)

59.    Throughout the negotiations, Lane repeated that termination was an option if settlement talks with FDOT broke down. But such a breakdown never occurred, and Lane did not press the point with its partners at that time. (JE 157, 364, 366, 385, 395; LA 11, 36; Doc. 526, pp. 165:15–166:9, 167:22–168:12.)

60.    That said, into spring 2019, Lane continued to struggle financially, and WeBuild continued to press Lane about the extent of the losses. While Skanska SE reported the JV's forecasted losses accurately internally, Lane was resistant to recognizing the extent of the losses to its lenders for its year-end 2018 financials. (JE 158, p. 1; JE 391, 426, 428; Doc. 531, pp. 207:1–15, 217:4–218:19, 219:9–11.)

61.    Meanwhile, the JV partners continued to face multimillion-dollar capital calls every few months throughout 2019, and Lane's purse strings were being tightly pulled by WeBuild. But in July 2019, the partners expected that SA22 would result in a $125 million payment to the JV. With this number on the horizon, Alger received the go-ahead from WeBuild's owner to pay Lane's share of the capital calls if the JV got that number (and reserved their rights to other claims). A few weeks later, on August 8, 2019, Alger confirmed that the parties had a "handshake deal" that only "need[ed] to be put to paper." But even though Alger had led Lane's negotiations, received the go-ahead from WeBuild's owner to pay,

and confirmed the handshake deal, a few days later, on August 13, 2019, Alger suddenly backpedaled, telling Fusco that "I am not authorized to agree to what we discussed and need to ask for an extension until the end of August as this decision has to be made by [WeBuild's owner] himself who is out until then." (JE 158, 408, 548; Doc. 526, pp. 177:3–185:17; Doc. 529, pp. 137:4–138:21, 144:24–145:13.)

62.     This reversal from Alger essentially irretrievably broke the partners' relationship, and things got worse quickly from there. In October 2019, Lane demanded for the first time in writing that SGL make the request for I4MP to terminate the CA. While Lane had pressed termination as an alternative, this demand was a surprise to its partners considering Lane's previous agreement to pursue SA22 and Alger's acknowledgment of the handshake deal. At that time, Skanska SE and Granite agreed SA22 was a good deal, and Lane had committed to it. (LA 142; SK 93, 94, 195; Doc. 528, pp. 26:17–27:17, 173:3–23; Doc. 529, p. 155:2–14; Doc. 532, pp. 76:10–77:3.)

63.     SGL's Executive Committee met in November 2019 to discuss Lane's demand. Lane insisted that SGL pursue the termination option immediately. Skanska SE reiterated H&K's earlier advice that the termination option was not viable and cautioned that pursuing the termination option at that point would kill SA22. The parties had yet to vote on SA22 because the terms were not finalized,

29

but Lane's position was set in stone. H&K produced additional memos in December 2019 and January 2020 concluding that SGL had no viable path to stop incurring losses immediately and could not establish a clear entitlement to the requisite 180 days of delay. (JE 27, 38; SK 195.)

64.    The terms of SA22 were finalized in January 2020. The evidence established that SA22 resulted in a very favorable terms for the JV. Financially, the settlement resulted in a $125 million payment from FDOT to SGL. The deal also massively curtailed SGL's exposure to likely liquidated damages by reducing the amount of delay-related damages for the express lanes from about $178,000 per day to about $4,600 per day; this was a very good deal because the JV was facing potentially $90 million in delay-related liquidated damages at the time SA22 was negotiated. But the deal also had significant nonmonetary concessions. FDOT agreed to require completion of only the general use lanes by the original substantial completion date of December 2020, which was more than doable and would get traffic flowing again on time; it granted about a year extension of the completion date for completing the express lanes, another significant concession for the JV as the schedule for the more difficult toll lanes was now achievable. Additionally, while the deal waived SGL's ability to pursue termination, it permitted SGL to file a "cumulative impact claim," seeking recovery of an additional $368 million for other issues. The cumulative impact claim remains

pending with FDOT. Given these favorable terms, as expected, Skanska SE and Granite voted for SA22; Lane voted against. Skanska SE exercised its contractual power as the managing partner to accept the deal over Lane's objection. SA22 was signed in April 2020. (JPS, ¶¶ 23–25; JE 79, 461, 500, 517; Doc. 314-22, p. 3; Doc. 314-32, pp. 2–3; Doc. 314-34; Doc. 526, p. 119:4–18; Doc. 527, p. 208:4–14; Doc. 528, pp. 153:13–154:5, 204:3–205:19; Doc. 529, pp. 89:22–91:25, 123:7–127:10; Doc. 530, pp. 151:1–152:23; Doc. 532, pp. 72:25–74:8, 181:17–21.)

### VII.   Completion & Litigation

65.     Once Lane voted against SA22, the writing was on the wall for the partners' relationship. The SA22 cash infusion stopped the capital calls temporarily, but by December 2020, the money ran out and the JV needed more to finish the Project. Facing another round of multimillion-dollar capital calls and with termination off the table because of SA22, Lane stopped paying. Lane sued Skanska SE in January 2021 for breaching its fiduciary duties as the JV's managing partner. Lane has paid no capital calls since filing suit. Skanska SE countersued Lane for breaching the JVA for not paying the capital calls. Granite, SGL, and WeBuild eventually joined the suit. (JE 548; SK 116; Docs. 1, 89, 143, 165.)

66.     As the litigation and the Project continued, Skanska SE and Granite continued to pay their portions (and only their portions) of the amounts called, with two exceptions. In April 2021, Granite refused to pay an "interim" capital call.

And in September 2021, Skanska SE paid an extra $570,000 on top of the amount called. To date, the JV partners have contributed around $487 million to SGL. (JE 548; SK 167; Doc. 532, pp. 132:20–134:25, 135:14–136:15, 140:14–142:17.)

67.   The Project was adequately funded despite Lane's failure to pay. The evidence showed that the capital calls made after Lane quit paying were not overstated in anticipation of Lane's failure to contribute but rather only called the amount needed to continue the Project. The Project was substantially completed in 2022. (JPS, ¶ 15; JE 548; SK 167; Doc. 532, pp. 54:5–11, 99:3–9, 197:18–198:16.)

68.   In June 2023, the Court granted summary judgment for Skanska SE on its breach of contract claim, finding that Lane breached the JVA when it stopped paying the capital calls and that damages remained to be determined at trial. The Court denied summary judgment on Lane's breach of fiduciary duty claim, sending that to trial. The bench trial was held in October 2023. (Docs. 418, 510–19.)

## CONCLUSIONS OF LAW

### I.   Fiduciary Claims

Lane claims that Skanska SE breached its fiduciary duties by acting in the best interest of Skanska ID rather than Lane (or the JV) in not pursuing the termination option. (Doc. 543, pp. 54–66.) The evidence does not support this claim.

"The elements of a claim for breach of fiduciary duty are: the existence of a

fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). Joint venture partners owe each other duties of loyalty and care, including to refrain from acting on an interest "adverse to the partnership" and from engaging in grossly negligent conduct. Fla. Stat. § 620.8404(2), (3). The Court found Skanska SE owes Lane these fiduciary duties as a JV partner, so only breach[8] and causation of damages are at issue. (Doc. 418, p. 13.)

Here, the evidence firmly establishes that Skanska SE was acting in the best interest of Lane and the JV when it chose not to pursue the termination option. *See Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. 4th DCA 2021) (fiduciary must act in entity's best interest). Lane spills much ink arguing that Skanska SE's purported conflict of interest caused it to act in favor of Skanska ID instead of the JV.

---

[8] Lane argues that it bears the burden of proof only to make out a *prima facie* case of breach and the burden then shifts to Skanska SE to show by clear and convincing evidence that its actions were aboveboard. (Doc. 543, p. 60.) But Lane cites no binding on-point authority in support of this contention. To the contrary, Florida's jury instructions on fiduciary duty claims set forth the typical preponderance standard, saying nothing about burden-shifting, and federal cases interpreting Florida law have done the same. *See* Fla. Standard Jury Instructions in Civ. Cases § 451.2; *e.g.*, *Landstar Glob. Logistics, Inc. v. Haskins*, No. 3:09-cv-1163, 2012 WL 39514, at *9 (M.D. Fla. Jan. 9, 2012) (Corrigan, J.) (applying Florida law) (following bench trial, finding that plaintiff failed to prove defendant breached fiduciary duty); *see also In re DeMasi*, 542 B.R. 13, 29 (Bankr. M.D. Fla. 2015) (applying Florida law). *But see Brigham v. Brigham*, 11 So. 3d 374, 386–87 (Fla. 3d DCA 2009) (collecting cases holding, in different fact pattern, that attorney entering into classically conflicted transaction with client bears burden of proving by clear and convincing evidence that transaction was fair). This argument is moot because even if the burden did shift to Skanska SE, the evidence overwhelmingly shows that Skanska SE acted in the best interest of the JV and Lane.

33

(Doc. 543, pp. 54–66.) But whether there was actually a conflict[9] is of no moment because the dispositive question is whether Skanska SE acted on that conflict *to Lane's detriment*, which the evidence shows it did not. *See, e.g.*, *Landstar Glob. Logistics, Inc. v. Haskins*, No. 3:09-cv-1163, 2012 WL 39514, at *9 (M.D. Fla. Jan. 9, 2012) (Corrigan, J.) (applying Florida law) (following bench trial, finding no breach where there was no evidence that defendant "purposely acted contrary to [plaintiff's] interests"). Rather, the JV's outside attorneys, Lane's fellow minority partner, and its own CEO/Chairman all acknowledged that pursuing or even threatening termination was severely financially and reputationally risky for everyone and the outcome was far from guaranteed. (JE 6, 25, 26; Doc. 477, p. 175; Doc. 526, p. 142:3–11.) That Granite also rejected termination puts the lie to Lane's assertion that Skanska SE's influence blocked the JV's "unbiased consideration" of that option. (Doc. 543, p. 7.) Logic dictates that if that option made sense for the JV, Granite would have joined Lane in advocating for it, exposing Skanska SE's supposed conflict in opposing—but it did not. On the other hand, SA22 resulted

---

[9] The evidence at trial made Lane's cries of conflict ring hollower than they did on a limited record at summary judgment. (*See* Doc. 418, p. 14 n.7.) Because not only did Lane know about the relationship between Skanska SE and Skanska ID before the venture, but also, Lane had worked with Skanska on P3s before *and* had been both majority and minority partner before, so its eyes were wide open going in. Lane knew how the interplay between majority and minority partners in the JV would work, and it knew how the interplay between the JV, the concessionaire, and the state would work. And Lane had its own boots on the ground at the Project every day throughout. So it was not in the dark at any point. (JE 158, 282, 426; Doc. 526, pp. 219:19–220:18; Doc. 529, p. 78:4–10; Doc. 534, p. 168:6–8.)

in an undeniably good deal for the JV, both financially and in terms of the
extension. (*See* JE 27, 158; Doc. 526, pp. 119:4–18, 183:23–184:1; Doc. 527, p. 208:4–
14; Doc. 528, pp. 153:13–154:5, 204:3–205:19; Doc. 529, pp. 89:22–91:25, 123:7–
127:10; Doc. 530, pp. 151:1–152:23; Doc. 532, pp. 72:25–74:8.) Faced with weighing
the termination option versus SA22, Skanska SE (and Granite) choosing the latter
was a no-brainer, not a breach. *Cf. FDIC v. Dodson*, No. 4:13-cv-416, 2014 WL
11511068, at *6 (N.D. Fla. Feb. 27, 2014) (Walker, J.) (applying Florida law and
citing Delaware law with approval) (noting that "intentionally acting with a
purpose other than that of advancing the best interests" breaches fiduciary duty
(cleaned up)).

Nor does the evidence show that Skanska SE rejecting termination caused
Lane any damages. Indeed, Lane acknowledged that no one knows exactly what
would have happened had the JV made a demand for termination. (Doc. 524,
p. 29:4–7.) This concession is damning. While difficulty in proving the amount of
damages does not bar recovery, there must still be a reasonable basis for the
damages—and the plaintiff must still prove it was damaged in the first place. *See
Storfer v. Guarantee Tr. Life Ins. Co.*, 666 F.3d 1277, 1280 (11th Cir. 2012) (applying
Florida law); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1540 (11th Cir.
1985) (same). But with the *fact of* damage purely speculative, there can be no
liability. *See Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319,

1342 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (applying Florida law and broadly collecting cases). Here, all credible[10] evidence suggests that the partners would have suffered significant damage by threatening or pursuing termination, and Skanska SE acted in the JV's best interest to avoid that outcome. (JE 6, 25, 26; Doc. 477, p. 175; Doc. 526, p. 142:3–11; Doc. 528, pp. 166:18–168:22, 171:22–172:17; Doc. 530, pp. 147:3–148:8.) So the evidence does not support the contention that rejecting termination caused Lane any harm.

Simply put, the evidence at trial was overwhelming that Skanska SE acted in SGL's and Lane's best interest in rejecting the termination option. With the evidence clearly showing there was no breach or causation of damages, Skanska SE is entitled to judgment in its favor on Lane's breach of fiduciary duty[11] and gross negligence[12] claims (Doc. 1, Counts I and II).

## II.    Contract Claims

Because Lane materially breached the JVA when it refused to pay the capital calls, the Court granted summary judgment in Skanska SE's favor on liability on

---

[10] Lane's expert Dennis's testimony that Lane suffered damages from SGL not seeking termination was unsupported and not credible, as discussed above. (Doc. 524, pp. 18:8–20:7; Doc. 527, pp. 83:11–84:20; Doc. 532, pp. 219:5–220:20, 221:8–225:4.)

[11] The Court already rejected Skanska SE's argument that the independent tort doctrine bars Lane's fiduciary claims and need not rehash it here. (*See* Doc. 51, pp. 9–10 & n.5.) But the argument is moot in any event because the evidence does not support the fiduciary claims.

[12] The gross negligence claim relies on the same evidence and legal foundation as the breach of fiduciary duty claim, so it fails for the same reasons. (Doc. 543, p. 52); *see Sullivan v. Streeter*, 485 So. 2d 893, 895 (Fla. 4th DCA 1986) (gross negligence requires conscious act likely to result in injury).

its breach of contract claim against Lane (Doc. 143, Count II)[13] and the same with Granite (Doc. 89, Count I).[14] (Doc. 418, p. 11.) The only remaining issue at trial on these claims was damages.

"Damages in a breach of contract action are intended to place the injured party in the same position [it] would have been in had the breach not occurred." *Telemundo Network, Inc. v. Spanish Television Servs., Inc.*, 812 So. 2d 461, 464 (Fla. 3d DCA 2002).

The amount of working capital that the partners paid in to SGL is not in dispute: $487,409,675.28, with Skanska SE paying $243,942,617.20, Granite paying $176,673,899.73, and Lane paying $66,793,158.35. (JE 548.) To rebalance the proportionate shares as if Lane paid what it was supposed to in the first place (JE 1, §§ 3.2, 8.2, 8.4), Lane should have paid 30% of the $487m total, or $146,222,902.58. Less the $66m it already paid, Lane owes $79,429,744.23 to make its partners whole, with $48,978,747.09 restoring Skanska SE to its proper 40% and $30,450,997.15 restoring Granite to its proper 30%. (JE 548; SK 167; *see* Doc. 532, pp. 132:20–137:9, 140:14–143:20.)

---

[13] The Court also concluded that liability was essentially established on Skanska SE's indemnification claim against Lane (Count I) and breach of guaranty claim against WeBuild (Count VI), but did not grant summary judgment because Skanska SE did not seek it. (Doc. 418, pp. 16–17 n.9.) The Court now grants judgment in Skanska SE's favor on those claims.

[14] The Court also granted summary judgment in Granite's favor on liability on its indemnification claim against Lane (Count II) and breach of guaranty claim against WeBuild (Count III). (Doc. 418, p. 16.)

With the rebalanced proportionate shares resolved, the Court turns to whether any portion of the money Skanska SE and Granite paid constituted "demand loans," which are due higher interest under the JVA. (JE 1, § 8.2.) The JVA defines payments as demand loans when the other partners pay part of a defaulting partner's share. (*Id.*) As to Skanska SE, there is no dispute that it paid $570,000.00 on top of its proportionate share of the September 2021 capital call, so that payment was a demand loan to Lane, entitling Skanska SE to higher interest on that amount. (JE 548, p. 2; *see* Doc. 543, p. 43 n.134.) On the other hand, the evidence establishes that Granite only ever paid its proportionate share of the calls and nothing more, so it made no payments that constituted demand loans. (JE 548; *see* Doc. 532, pp. 172:8–173:1, 176:3–16.)

Finally, the question remains whether Lane owes anything to SGL. The Court granted summary judgment in SGL's favor on liability on its breach of contract and indemnification claims against Lane (Doc. 165, Counts I and III).[15] (Doc. 418, p. 16.) But the evidence establishes that the JV itself suffered no damages, given that the other partners covered for Lane's default and SGL had sufficient money to keep the Project going.[16] (*See* JE 548; Doc. 532, pp. 54:5–11,

---

[15] SGL abandoned its remaining claim against Lane for breach of fiduciary duty (Count IV), so that claim is dismissed. (Doc. 537, p. 7 n.2.)

[16] SGL's assertion that Lane should pay $16 million to cover the "estimated" costs needed to complete the Project in the future was not supported by the evidence, as the amount is too speculative to form a reasonable basis for damages, especially given the unresolved cumulative impact claim pending with FDOT. (Doc. 524, pp. 63:16–64:6; Doc. 532, pp. 197:18–198:16.) Nor can

99:3–9, 197:18–198:16.) So to make SGL whole, the Court could either order Lane to rectify its underpayment to SGL and then SGL would have to reimburse Skanska SE and Granite *or* order Lane to pay Skanska SE and Granite back directly—but not both. (JE 1, § 8.1; Doc. 532, pp. 180:8–24, 198:25–199:15); *see Atl. Coast Line R.R. Co. v. Saffold*, 178 So. 288, 290 (Fla. 1938) ("Double damages are not legally recoverable."). To skip the middleman, the Court will require the latter.

So Skanska SE is owed about $48.9 million and Granite is owed about $30.4 million, plus interest. Lane and WeBuild, as Lane's guarantor, are jointly and severally liable on the amounts owed to Skanska SE and Granite. (JE 40, p. 3; JE 66, p. 1); *see supra* notes 13–14. *See generally New Holland, Inc. v. Trunk*, 579 So. 2d 215, 216–17 (Fla. 5th DCA 1991). As to indemnification of attorney's fees and costs (JE 1, § 8.4; *see* Doc. 540, pp. 130–31), Skanska SE and Granite must file separate motions. *See* Local Rule 7.01.

## CONCLUSION

**IT IS SO ORDERED**. By **Friday, May 17, 2024**, the parties are **DIRECTED** to submit a joint proposed final judgment in line with this Order.[17]

**DONE AND ORDERED** in Chambers in Orlando, Florida, on May 3, 2024.

---

the Court rule on a future controversy between the parties about winding up the Project that has not yet happened. *See Khan v. Metro. Cas. Ins. Co.*, No. 6:12-cv-1354, 2014 WL 12791874, at *5 (M.D. Fla. Mar. 6, 2014).

[17] This proposal should include the appropriate calculation of prejudgment interest. (*See* Doc. 540, pp. 129–30.)



ROY B. DALTON, JR.
United States District Judge